# EXHIBIT F

# Attachment 2
## Department Issues Report

DEPARTMENT ISSUES REPORT

TELECOMMUNICATION TOWERS
ST. JOHNS COUNTY
ZONING
COMMENTS

Application Number: TOWER2008000001         Submittal #: ALL

Project Name: AT148/Fruit Cove @ St. Patrick's Episcopal Church

Applicant: Anchor Tower

**When design changes are made to subsequent submittals that are not the result of comments from a previous review, they must be brought to the attention of county staff. Failure to do so may result in additional submittals or possible delays during construction.**

**Notice: Please read staff comments carefully as they may individually cite to specific provisions in the law or local regulations denying your development permit as defined in Chapter 163.3164 and pursuant to Chapter 125.022, Florida Statutes.**

---

# Submittal #: 1

## DEPARTMENTS

## GIS NEIGHBORHOOD BILL OF RIGHTS

Information Only:

At this time there is one Neighborhood Boundary (River Oaks Plantation Home Owners Association ) within 300 feet of this project.
Michael Campbell, GISP, 904.209.0778, mcampbell@sjcfl.us

## APPLICATION REVIEW MANAGER

Application reviewed and signed off.

## CONCURRENCY/TRANSPORTATION PLANNING

Information Only:

Request is not subject to concurrency pursuant to Section 11.00.02 of the Land Development Code.

Information Only:

DEPARTMENT ISSUES REPORT

Jan Trantham Transportation Planning/Concurrency 904-209-0611 904-209-0612 (fax)
jtrantham@sjcfl.us

## PLANNING DIVISION

1. Policy A.2.1.3 requires new development within the Northwest Sector Overlay to provide a minimum 35' development edge along the perimeter of the development boundary. Parking, structures, storage areas, etc are not permitted within the development edge. Please clearly label and depict on the site plan.

Information Only:

Planning Division Reviewer: Michael Blackford, Planner II (904) 209-0593 mblackford@sjcfl.us

## ZONING PROGRAM

1. Land Development Code Section 6.08.12.H. states that the finished color of the tower shall have either galvanized or a dull blue or gray finish. Your application states it is to be white. Please revise.

2. Land Development Code Section 6.08.12.V. states that "No Antenna Tower shall be built or erected within six hundred (600) feet of the center line of any designated Scenic Highway or Scenic Roadway without final approval of the Board of County Commissioners, after consideration and recommendation by the Planning and Zoning Agency."

Your application states that the tower will be 350' from the roadway of SR 13.

Upon recommendation of the Planning and Zoning Agency, this item will be scheduled for the next available Board of County Commissioner meeting.

Information Only:

Zoning staff report will be prepared after a review of the application and site visit to determine compatibility. A copy of this report will be mailed to you in advance of the hearing. If you have any questions, please feel free to contact the reviewer: Marie Hobbs, Zoning Manager at 904-209-0662.

mhobbs@sjcfl.us

## DEVELOPMENT REVIEW TECHNICAL

Application reviewed and signed off.

## COUNTY UTILITY DEPARTMENT

Information Only:

Not in S.J.County Utility Department service area. No additional comments. Reviewed by: Melissa Caraway, SJCUD, 209-2606.

## FIRE SERVICES

DEPARTMENT ISSUES REPORT

Application reviewed and signed off.

## ENVIRONMENTAL HEALTH DEPARTMENT

Information Only:

No comment if project is served by sanitary sewer and public water and the request does not impact any proposed septic system.  John W. Cochrane  823-2514 X 104  johnw_cochrane@doh.state.fl.us

## ENVIRONMENTAL PLANNING

1. Please provide documentation that a qualified scientist has assessed the site for the presence or potential occurrence of listed species and submit a map that identifies and locates any listed species and associated essential habitat currently or previously documented to exist within project boundaries. Further, the documentation should discuss the methodology as well as the findings of this assessment. (Section 4.01.08, Land Development Code)

Information Only:

Reviewer's Name and Contact Information: Ryan Mauch -(904)209-0621 rmauch@sjcfl.us

## GIS DEPARTMENT

The address for the tower will be:

1217 State Road 13 N
Saint Johns, FL 32259

Please correct the address on all applicable pages of the plans.

Information Only:

Lisa Tillman, 904.827.6995, ltillman@sjcfl.us
Carlie Hulbert, 904.209.0804, chulbert@sjcfl.us

Information Only:

The address corrections may be red-lined.

## OFFICE OF COUNTY ATTORNEY

Please fully address each of the issues raised by staff, this office will then make further legal review and comment as necessary.

Information Only:

*Reviewed by* Regina D. Ross, Asst. County Attorney; rross@sjcfl.us; 904.209.0805 (Office)

## BUILDING

DEPARTMENT ISSUES REPORT                                    Page 4 of 6

Information Only:

- James Drummond 904-827-6832 jdrummond@sjcfl.us

---

# Submittal #: 2

## DEPARTMENTS

## GIS NEIGHBORHOOD BILL OF RIGHTS

Information Only:

At this time there is one Neighborhood Boundary (River Oaks Plantation Home Owners Association ) within 300 feet of this project.
Michael Campbell, GISP, 904.209.0778, mcampbell@sjcfl.us

## PLANNING DIVISION

1. Policy A.2.1.3 requires development within the Northwest Sector Overlay to provide a minimum 35' development edge along the perimeter of the development boundary. Parking, structures, storage areas, etc are not permitted within the development edge. Please clearly label and depict on the site plan.

**Tuesday, September 23, 2008** - It appears that the access easement has been relocated outside of the required 35' development edge, however, the development edge still needs to be clearly depicted and labeled on sheets C-1 and C-2.

Information Only:

Planning Division Reviewer: Michael Blackford, Planner II (904) 209-0593 mblackford@sjcfl.us

## ZONING PROGRAM

2. Land Development Code Section 6.08.12.V. states that "No Antenna Tower shall be built or erected within six hundred (600) feet of the center line of any designated Scenic Highway or Scenic Roadway without final approval of the Board of County Commissioners, after consideration and recommendation by the Planning and Zoning Agency."

Your application states that the tower will be 350' from the roadway of SR 13.

Upon recommendation of the Planning and Zoning Agency, this item will be scheduled for the next available Board of County Commissioner meeting.

**Added 9/22/08** - this will remain an open comment to be included in conditions of Final Order.

Information Only:

DEPARTMENT ISSUES REPORT                                                    Page 5 of 6

Zoning staff report will be prepared after a review of the application and site visit to determine compatibility. A copy of this report will be mailed to you in advance of the hearing. If you have any questions, please feel free to contact the reviewer: Marie Hobbs, Zoning Manager at 904-209-0662.

mhobbs@sjcfl.us

## ENVIRONMENTAL PLANNING

1. Please provide documentation that a qualified scientist has assessed the site for the presence or potential occurrence of listed species and submit a map that identifies and locates any listed species and associated essential habitat currently or previously documented to exist within project boundaries. Further, the documentation should discuss the methodology as well as the findings of this assessment. (Section 4.01.08, Land Development Code)

Friday, September 19, 2008: Please submit documentation concerning listed species as stated above.

Information Only:

Reviewer's Name and Contact Information: Ryan Mauch -(904)209-0621 rmauch@sjcfl.us

## GIS DEPARTMENT

Information Only:

Lisa Tillman, 904.827.6995, ltillman@sjcfl.us
Carlie Hulbert, 904.209.0804, chulbert@sjcfl.us

Information Only:

The address corrections may be red-lined.

## OFFICE OF COUNTY ATTORNEY

Please fully address each of the issues raised by staff, this office will then make further legal review and comment as necessary.

Information Only:

*Reviewed by* Regina D. Ross, Asst. County Attorney; rross@sjcfl.us; 904.209.0805 (Office)

---

# Submittal #: 3

## DEPARTMENTS

## GIS NEIGHBORHOOD BILL OF RIGHTS

DEPARTMENT ISSUES REPORT                                                    Page 6 of 6

Information Only:

At this time there is one Neighborhood Boundary (River Oaks Plantation Home Owners Association ) within 300 feet of this project.
Michael Campbell, GISP, 904.209.0778, mcampbell@sjcfl.us

## PLANNING DIVISION

Information Only:

Planning Division Reviewer: Michael Blackford, Planner II (904) 209-0593 mblackford@sjcfl.us

## ZONING PROGRAM

2. Land Development Code Section 6.08.12.V. states that "No Antenna Tower shall be built or erected within six hundred (600) feet of the center line of any designated Scenic Highway or Scenic Roadway without final approval of the Board of County Commissioners, after consideration and recommendation by the Planning and Zoning Agency."

Your application states that the tower will be 350' from the roadway of SR 13.

Upon recommendation of the Planning and Zoning Agency, this item will be scheduled for the next available Board of County Commissioner meeting.

**Added 9/22/08** - this will remain an open comment to be included in conditions of Final Order.

Information Only:

Zoning staff report will be prepared after a review of the application and site visit to determine compatibility. A copy of this report will be mailed to you in advance of the hearing. If you have any questions, please feel free to contact the reviewer: Marie Hobbs, Zoning Manager at 904-209-0662.

mhobbs@sjcfl.us

## ENVIRONMENTAL PLANNING

Information Only:

Reviewer's Name and Contact Information: Ryan Mauch -(904)209-0621 rmauch@sjcfl.us

## OFFICE OF COUNTY ATTORNEY

Information Only:

*Reviewed by* Regina D. Ross, Asst. County Attorney; rross@sjcfl.us; 904.209.0805 (Office)





© TOWER 2008-01 AT148/Fruit Cove @ St. Patrick's Episcopal Church 11/25/2008





# Attachment 4
## Adjacent Property Owner Responses

## Marie Hobbs

**From:**      t_romani@bellsouth.net
**Sent:**      Sunday, December 07, 2008 5:57 PM
**To:**        Marie Hobbs
**Subject:** Communication Tower at St Patrick's Episcopal Church

Robert and Teresa Romani
1280 White Ibis Ct
Saint Johns, FL 32259
12/07/2008

To Whom this Concerns:
We are greatly concerned regarding this "Stealth communication Tower" being placed in our
neighborhood.  First, we are afraid it can and will depreciate the value of our homes.  We have lived
here for 13 years now and value our home and neighborhood.  Secondly, our community already has a
buzzard/vulture problem and these towers tend to be a roosting site for them.  There is currently a tower
2 miles from here (Mills Field off Racetrac Rd).  There are anywhere from 50-100 buzzards roosting
there on a daily basis.  These birds are natures sanitation workers.  They are smelly, unsanitary, and can
be destructive to personal property.  We have a screen enclosure that we are particularly concerned
with.  There must be a more environmentally, friendly location that this could be located for all
involved!

Sincerely.
Robert and Teresa Romani

12/8/2008

**From:** Al Abbatiello [mailto:alabbat@bellsouth.net]
**Sent:** Thursday, December 11, 2008 4:08 PM
**To:** Virginia Janssen
**Cc:** Michael Blackford
**Subject:** Tower 2008-01, 1221 State Road 13, St. Patrick's Episcopal Church

Virginia,

With reference to the proposed Monocross tower at St. Patrick's Episcopal Church, 1221 State Road 13 in St. Johns County please be advised the William Bartram Scenic and Historic Highway Management Council will ask the County Planning and Zoning Agency to deny approval of the proposed tower when they meet on December 18, 2008.

Assuming this matter will later be presented to the Board of County Commissioners (BCC) be advised my organization will also ask the BCC to deny approval of the proposed tower.

The Northwest St. Johns County Sector Plan and St. Johns County Land Development Codes specifically prohibit cell towers within 600 feet of a scenic highway.   The scenic highways of St. Johns County have been so designated because they are scenic and historic and cell towers along these roadways are contrary to the original intent of preserving the integrity of these scenic and historic areas.

St. Johns County, State of Florida, support groups, and countless numbers of citizens have devoted time, energy, and a great deal of money into preserving the beauty of our scenic highways.   Federal, State, and County grants and private funds are used to develop comprehensive master plans for the ongoing management, maintenance, and enhancement of our scenic and historic resources.   Accordingly, the William Bartram Scenic Highway Corridor Management Council will request denial of this application.

 In the general area of Fruit Cove a variety of cell towers already exist. I'm aware, additional towers are proposed in or near the Julington Creek Plantation development and I suggest the carriers looking to provide cell service in this area review those tower proposals for the extended wireless coverage desired.   In fact, within 1.5 air miles of the proposed tower location on Worth Road (South of the church) there is a tower site where two communications towers already exist and perhaps one more tower could be erected on the site.   Attached is a copy of an aeronautical map with the location of these towers (just below the word "inset" near the center of the map.

Sincerely,

**William Bartram Scenic and Historic Highway**
**Management Council**

Albert J. Abbatiello
Chairman
904-287-5577



**Marie Hobbs**

**From:**    smith1296@aol.com
**Sent:**    Saturday, December 13, 2008 2:47 PM
**To:**      Marie Hobbs
**Subject:** File #: TOWER 2008-01, AT148/Fruit Cove @ St. Patrick's Episcopal Church

Develop ent Services
Zoning Program Office
Permit Center Building
4040 Lewis Speedway
St. Augustine, FL 32084
(Via email: Zoning2@sjcfl.us)

December 13, 2008

**Pursuant to your Adjacent Property Owner notice,** regarding the application filed by Anchor Tower, 1133 Louisiana Ave., Suite 114, Winter Park, FL 32789 for property location at 1221 State Road 13, I hereby request consideration be made to not approve the Special Use Permit to allow a Stealth communication Tower Monocross and installation of Metro PCS equipment and antenna in RS-E zoning district as allowed per section 2.03.26 and 6.09.12

To be denied.

I have enjoyed being a next door neighbor to the St. Patrick's Episcopal Church located at 1221 State Road 13 for approximately 10 years and look forward to many more.  The natural beauty of the Fruit Cove area if slowly disappearing.  I would so much prefer to see the natural landscape remain the same rather than to have another one of those unsightly towers that can attract unwanted buzzard roosts like the one right around the corner on Race Track Road (behind the Gate on the corner of Race Track Road & State Road 13) and behind Mills Field playing fields.

With no remorse or hard feelings toward my church neighbors, I would prefer not to have the tower installed and the area left in it's natural environment.

I also feel the tower can have a negative effect on property value and home resale's in the area.  Thank you for considering this matter.


Sincerely,
Thomas J. Ellis
1275 White Ibis Court
Fruit Cove, FL 32259
via email address: smith1296@aol.com

Listen to 350+ music, sports, & news radio stations – including songs for the holidays – FREE while you browse. Start Listening Now!

12/15/2008

*Tower 2008-01*

## Marie Hobbs

**From:** Gregory Zentz [zentzone9@mac.com]
**Sent:** Thursday, December 18, 2008 9:39 AM
**To:** Marie Hobbs
**Subject:** Comments on Special Use Permit for Stealth communication Tower. Property at 1221 State Road 13 in Saint Johns County. From Resident within 300' of tower.

Dear Ladies and Gentlemen,

I'm writing regarding **Requested Change: Special User Permit to allow a Stealth communications Tower. Monocross and installation of Metro PCS equipment in RS-E zoning district.** I am unable to attend the 1:30 PM Meeting today and speak before the Planning and Zoning Board.

I wish to register my objection to allowing this Special Permit. My reasons are as follows:

1. The original notification "Adjacent Property Owner Notice" did **NOT** include "...attached Map or Maps..." showing the exact, proposed location on the indicated property for this currently unapproved use. Yes, there were several verbal descriptions as to the location but they were filled with the, to us, unintentionally arcane nomenclature of zoning and property departments and, even so, required having, well, a map or maps, to visualize where this 'Stealth' electronic device would be placed. It was unclear if the address listed was the actual address or some hundreds of feet 'from' that address.

2. I have not seen any signs identifying the property location and/or location of the device. (That doesn't mean they are not there, but due to confusion from 1. above, knowing where to look for the signs has been difficult.)

3. The fact that property owners within 300 feet of the proposed device have been notified, causes me to ask 'why'? What is the nature of this device that causes it to be of concern to people who live that close to it? That is to say, what is it's potential impact?

a. I understand 'Stealth communication Tower' to indicate a disguised device that will resemble in some way, something natural (E.g. a Tree). Having something that 'blends in', however beautifully or awkwardly, with the surrounding environment, seems good and would not be my primary concern. So I conclude that allowing a Special User Permit for putting up a device that will 'blend in' would **NOT** be the reason for notifying people who live within 300' of the device (as do my wife and I).

b. Rather, the paramount reason I can see for notifying those of us who live within that range would be that there must be scientific evidence that radiation generated by such a device would be of a nature or degree as to be of concern to those living closest to it.

5. Since there was no documentation provided in the 'Adjacent Property Owner Notice' as to scientific studies addressing concerns of the radiation effects on my wife and I, who live within 300' of the proposed device, and that job responsibilities do not allow me to drive to Saint Augustine for today's meeting, I have to voice my very strong objection to allowing this permit.

At such time as this kind of information is provided (from footnoted, scientific source material that can be verified against current studies as opposed to 'Industry Data on the safety of such devices') that indicate there is little risk to living within the 300' zone I will have to solidly object to the placement of

12/18/2008

this tower and antenna.

Until that time, I ask you to **NOT approve the Special User Permit.**

Thank you for your time.

Mr. and Mrs. Gregory Zentz
1233 Morning Dove Court
Saint Johns, FL 32259
(904) 287-9766

12/18/2008

## Marie Hobbs

| | |
|---|---|
| **From:** | teresa.terhune@wachovia.com |
| **Sent:** | Tuesday, January 13, 2009 10:40 PM |
| **To:** | Marie Hobbs |
| **Cc:** | tterhune1111@yahoo.com |
| **Subject:** | File #Tower 2008-01, AT148/Fruit Cove@St. Patricks Episcopal Church |

Please note for your records that I **oppose** this proposed Tower. My home property address is 1290 White Ibis Court, Fruit Cove, Florida. My home telephone number is 904/287-1510. I am traveling this week and unable to access my personal e-mail so I am sending this from my work e-mail address. If any response to me is necessary, please use my personal e-mail address of: tterhune1111@yahoo.com.

Thank you.

Teresa T. Terhune

**Teresa Terhune**
Retail Portfolio Manager
Corporate Real Estate
4899 Belfort Road, Suite 100
Jacksonville, FL 32256
Mailcode: FL0495
(904) 489-9921 office
(904) 489-9911 fax
(305) 807-7469 cell

**WACHOVIA**

teresa.terhune@wachovia.com

**"PARTNERING IN EXCELLENCE"**

1/14/2009

# Attachment 5
### Additional Information Received Since Planning and Zoning Agency Meeting

## Marie Hobbs

| | |
|---|---|
| **From:** | Lindsay Haga |
| **Sent:** | Tuesday, February 10, 2009 5:11 PM |
| **To:** | Dawn Lange |
| **Cc:** | Marie Hobbs |
| **Subject:** | FW: Re: Stealth Tower Planning and Zoning |

For the upcoming Tower application.

**From:** Commissioner Cyndi Stevenson
**Sent:** Tuesday, February 10, 2009 4:48 PM
**To:** Diane Gorski; Lindsay Haga
**Subject:** FW: Re: Stealth Tower Planning and Zoning

Diane-for other commissioners as desired & to planning for their information.

*Cyndi Stevenson*

*St. Johns County Commissioner*

*District 1*

*Office: (904) 230-4784*

*Cell: (904) 669-2188*

*PLEASE NOTE: Most recorded communications to or from government officials regarding government business are public records available to the public and media upon request.*

**From:** ilivesoccer@bellsouth.net [mailto:ilivesoccer@bellsouth.net]
**Sent:** Monday, February 09, 2009 12:16 PM
**To:** Commissioner Cyndi Stevenson
**Subject:** FW: Re: Stealth Tower Planning and Zoning

Hi Cyndi,
I complying with the request below. We use Sprint and are not able to get service in our house. We have used Sprint for 8 years. We have 4 cell phones and all have recently been replaced and we have to go outside to receive or make calls on our cell phones which is absolutely ridiculous. Hope you are doing well.
Take care.
Bette Swift

|------------- Forwarded Message: -------------
| From: "CHARLES STUART" <kcantq@msn.com>
| To: "MaxPeggyNew Mills" <rmpmills@comcast.net>,"CarolnPete Neilson"
| <neilsonp@bellsouth.net>,"ValerieWork Klacsmann"
| <valerie.klacsmann.qgwc@statefarm.com>,"Mark Hyman"

2/11/2009

<Mark_Hyman@bellsouth.net>,"Margaret Eicens" <eicens@att.net>,"Mickeywork Gray"
<Mickey.Gray@lyondellbasell.com>,"Randy Swift"
<ilivesoccer@bellsouth.net>,"MotherPatwork Turk" <pdturk@stpatricksepiscopal.org>,"Hugh
Mcclelland" <HMcClelland@geico.com>
Subject: Re: Stealth Tower Planning and Zoning Hearing
Date: Sat, 07 Feb 2009 17:03:51 +0000

If any of you know of anyone in the JCP/St. Patrick's area that have trouble with cell phone
reception, it would be great if they sent an email or letter in support of a tower on our property to
Cyndi Stevenson, our district commissioner and chair of the Board and maybe Ron Sanchez,
vice-chair. Cyndi lives in JCP and Ron lives south of here on CR13. Cyndi's email is
bccd1@sjcfl.us , Ron's email is bccd2@sjcfl.us . Their work address is 500 San Sebastian View,
St. Augustine, Fl 32084. Blessings, KT

—— Original Message ——
From: McClelland, Hugh
To: peggy-max ; CarolnPete Neilson ; CHARLES STUART ; Valerie Klacsmann ; Mark Hyman ;
Margaret Eicens ; Gray, Mickey J ; Randy Swift ; Rev. Patricia Daniel-Turk
Sent: Thursday, February 05, 2009 9:19 PM
Subject: Stealth Tower Planning and Zoning Hearing

Just a short note to the vestry re: the stealth tower application before the Planning and Zoning Agency
(PZA) this afternoon at the St Johns County Auditorium-

- Planning and Zoning's staff found the application in conformance and recommended the 7
  agents approve it (Messrs. Green, Nelson, Laidlaw, Williams, Hanson, Wheeler, and Connor).
  Yea!
- Mother Patricia, Katey, Charlie, and Margaret each spoke to the agents in support of the
  application. Yea! Two people spoke against it, one because she said the tower service was not
  needed and the other because he said it was contrary to the charter of the Bartram Trail Scenic
  Highway. Boo!
- Anchor Tower's attorney and Val Kazia presented a summary of their application and answered
  questions from the 7 agents. Yea!
- After 90 minutes of discussion, the PZA voted 4 to 3 to recommend the application for approval
  to the Board of County Commissioners. Yea! The 3 No votes (Laidlaw, Williams, and Hanson)
  essentially said the tower wasn't needed because there was service available to the area, if not
  from the applicant's company. Boo!

After the meeting Val explained that now the application and recommendation go to the County
Commissioners who should approve based on the PZA recommendation. He said stay tuned,
hopefully we'll have the green light in the next 30 days. Also, Anchor Tower's attorney, Mary (I don't
know her last name) told me that our presence and voice in support of the application definitely helped.

Hugh McClelland
904-287-2121 (w)
904-608-0175 (c)
214-452-9634 (f)

=====================
This email/fax message is for the sole use of the intended
recipient(s) and may contain confidential and privileged information.
Any unauthorized review, use, disclosure or distribution of this
email/fax is prohibited. If you are not the intended recipient, please
destroy all paper and electronic copies of the original message.

2/11/2009

## Marie Hobbs

| | |
|---|---|
| **From:** | Lindsay Haga |
| **Sent:** | Wednesday, February 11, 2009 5:21 PM |
| **To:** | Dawn Lange |
| **Cc:** | Marie Hobbs |
| **Subject:** | FW: Cell Tower at St Patricks Episcopal Church |

**From:** Commissioner Cyndi Stevenson
**Sent:** Wednesday, February 11, 2009 5:15 PM
**To:** Margaret Eicens
**Cc:** Lindsay Haga
**Subject:** RE: Cell Tower at St Patricks Episcopal Church

Thank you for your email. I am forwarding it to planning staff so they can include it in their consideration prior to the recommendation to the Board of County Commissioners.

Kind regards,

Cyndi Stevenson
St. Johns County Commissioner
District 1
Office: (904) 230-4784
Cell: (904) 669-2188

PLEASE NOTE: Most recorded communications to or from government officials regarding government business are public records available to the public and media upon request.

**From:** Margaret Eicens [mailto:eicens@att.net]
**Sent:** Wednesday, February 11, 2009 12:05 PM
**To:** Commissioner Cyndi Stevenson
**Subject:** Cell Tower at St Patricks Episcopal Church

Dear Cyndi:
    Please vote in favor of the proposed cell tower to be erected at St Patrick's Church. I live at 1568 Beluthahatchee Road and though I have reception there , the signal is weak and differs from one side of the house to the other, and also it depends on the time of the day I receive calls. I do not have a land line so I depend on my cell phone. I believe that the proposed cell tower will enhance my ability to use my cell phone.
Thank you,
Margaret Eicens
1568 Beluthahatchee Road
St Johns, FL 32259

2/12/2009

## Marie Hobbs

| | |
|---|---|
| **From:** | Lindsay Haga |
| **Sent:** | Friday, February 20, 2009 7:56 AM |
| **To:** | Pelion Shugart |
| **Cc:** | Marie Hobbs |
| **Subject:** | FW: Ltr to Jerry Cameron from Ellen Whitmer re cell tower |
| **Attachments:** | 9818.pdf |

Please scan and add to the file.

**From:** Patrick McCormack
**Sent:** Thursday, February 19, 2009 3:11 PM
**To:** James Whitehouse
**Cc:** Lindsay Haga
**Subject:** FW: Ltr to Jerry Cameron from Ellen Whitmer re cell tower

*Under Florida law, e-mail addresses are public records. If you do not want your e-mail address released in response to a public records request, do not send electronic mail to this entity. Instead, contact this office by phone or in writing.*
*This communication may contain privileged and confidential information intended only for the addressee (s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution or duplication of this communication is strictly prohibited. If you are not the intended recipient, please notify the sender by reply email and destroy all copies of the original message.*
***IRS Circular 230 Disclosure:*** *To ensure compliance with U.S. Treasury Regulations governing tax practice, the St. Johns County Attorney's Office hereby informs and notifies each addressee hereof, including any copied addressee, that any U.S. federal tax advice contained in this communication (including any attachments), unless otherwise specifically stated, is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties that may be imposed on the addressee under the Internal Revenue Code and the regulations promulgated thereunder; or (ii) promoting, marketing or recommending to another party any transaction(s) or matter(s) addressed herein. To the extent that this communication may be deemed to contain any U.S. federal tax advice, then unless otherwise specifically stated herein, the addressee is expressly notified by the St. Johns County Attorney's Office that the addressee may not and cannot rely or base any decision, action or inaction upon the same, but should seek advice based on the addressee's particular circumstances from an independent tax advisor.*

**From:** Judy Hamilton
**Sent:** Thursday, February 19, 2009 3:09 PM
**To:** Patrick McCormack; Michael Hunt
**Cc:** 'Diane Lehmann'
**Subject:** Ltr to Jerry Cameron from Ellen Whitmer re cell tower

2/20/2009

**ELLEN A. WHITMER**
**1178 NATURES HAMMOCK RD. S.**
**FRUIT COVE, FL 32259**
**FEBRUARY 17, 2009**
**904-287-5387**

# RECEIVED

FEB 1 9 2009

## COUNTY ATTORNEY

Mr. Jerry Cameron,
Assistant County Administrator
St. Johns County
500 San Sebastian View
St. Augustine, FL 32084

Dear Mr. Cameron,

This letter is in response to discussion held at the February 9, 2009 meeting of the St. Johns County Civic Roundtable in St. Augustine. The application for a special use permit for the location of a cell tower along SR 13 or the William Bartram Scenic and Historic Highway is the subject of concern.

The location of the proposed cell tower is on property located in a residential E zoning category and the site is at the St. Patrick`s Episcopal Church on SR 13 known as the William Bartram Scenic and Historic Highway. The proposed siting of this 150 foot tower is in violation of the St. Johns County Comprehensive Land Plan objective A.1.3. that defines surrounding land uses and compatibility. Objective A.1.3.8 specifically does not allow commercial development of land within 600 feet of the center line of SR 13/ CR 13. The tower does meet the legal definition of commercial as in the background definitions for the land use element for the future land use. Therefore, it is against the County`s Comprehensive Land Plan to allow the placement of this tower as proposed. A special use permit cannot nullify the Comprehensive Land Plan.

The Constitution of the State of Florida defines in Article I, section 3 that there be no law respecting the establishment of religion. If land use laws are. circumvented and churches are given the right to enter commercial business as a result, then in effect, religion is aided or established by the land use decisions.

Included with this letter are supporting documents and literature. Please contact me if you should need to do so. Thanks for your attention in this matter.

Sincerely,

Ellen A. Whitmer

## Objective A.1.3
### Surrounding Land Use

The County will locate future land uses so that adjacent land uses are compatible and complementary. In addition, by 2005, the County shall develop a strategic plan which addresses those techniques that can be used to revitalize blighted areas, as defined by Chapter 163, F.S., including, but not limited to, maintenance, improvement, or replacement of existing structures; and the implementation of related policies contained in the Plan's Housing Element.

**Policies**

A.1.3.1    By December 1999, the County shall develop and adopt standards and procedures, as appropriate, which shall provide for adequate buffer requirements between incompatible uses such as commercial and industrial uses and residential uses.

A.1.3.2    By December 1999, the County shall develop and adopt standards and procedures, as appropriate, which shall establish design guidelines and standards for developments adjacent to major roadways.

A.1.3.3    The County shall provide technical assistance and information to the private sector for the redevelopment of blighted areas.

A.1.3.4    The County shall pursue available state and/or federal revenue sources in order to obtain funding to improve blighted areas.

A.1.3.5    The County shall continue to investigate the availability of Federal Community Development Block Grants (CDBG) funds for housing rehabilitation and demolition/replacement housing.

A.1.3.6    Commercial development along SR A1A from the Duval/St. Johns County line south to Vilano Road shall be permitted only on land zoned to permit Commercial development as of the date of adoption of this Plan Amendment consistent with the uses allowed by the applicable land use designation on the Future Land Use Map, or on lands designated for Commercial on the Future Land Use Map. Additional Commercial development on lands not zoned to permit Commercial development, or on lands not designated for Commercial on the Future Land Use Map, shall only be permitted with a Comprehensive Plan amendment to the Future Land Use Map and approved through the Planned Development land development regulations. In evaluating such Comprehensive Plan amendment, the County shall consider each of the following:

    (a)    the proposed Commercial development is at a size and scale compatible with the surrounding area and will not cause adverse impacts to surrounding properties or the natural environment;

(b)  adequate public facilities exist to serve the intended Commercial development;

(c)  there is a demonstrated deficiency of other available lands designated Commercial to accommodate the proposed Commercial use, and the applicant has demonstrated that a need exists for the proposed Commercial development, based on the size, scale and population of the area being served;

(d)  the proposed development will promote compact commercial centers or districts rather than a strip commercial development pattern, characterized by continuous linear commercial frontage along the roadway; and

(e)  the amendment is consistent with the policies contained in Objective A.1.5 of this Plan.

A.1.3.7  The County shall adopt and implement a SR A1A Corridor Zoning Overlay District for lands adjoining SR A1A. The limits of this Corridor Zoning Overlay District shall be established in the County land development regulations and shall establish, at a minimum, standards for signs, buffers and screening, lighting, and setbacks within the Overlay District.

A.1.3.8  Commercial development of land shall not be permitted within six hundred (600) feet of the centerline of those portions of SR 13/CR 13 designated as the William Bartram Scenic Highway, except as follows:

(a)  from the Julington Creek bridge to the intersection of SR 13 and SR 16 (Shands Bridge), Commercial development shall only be permitted on those parcels of land zoned to permit Commercial development, consistent with the uses allowed by the applicable land use designation on the Future Land Use Map, as of the date of adoption of this Plan Amendment; and

(b)  from the intersection of SR 13 and SR 16 (Shands Bridge) to SR 207, Commercial development shall only be permitted on:

(i) those parcels of land zoned to permit Commercial development as of the date of the adoption of this Plan Amendment consistent with the uses allowed by the applicable land use designation on the Future Land Use Map; or

(ii) those parcels of land which, through the Planned Development land development regulations, are zoned and permitted for Neighborhood Commercial or Rural Commercial uses pursuant to the Plan's requirements and are approved for Commercial uses through a Comprehensive Plan amendment to the Future Land Use Map.

(c)  a Community Commercial Center located at the intersection of SR 13 and Racetrack Rd.; and

(d)  on lands designated Commercial on the Future Land Use Map as of the date of

adoption of this Plan Amendment.

    (e)    a Community Center District (CCD) will be located within the RiverTown DRI, along the East and West side of SR 13 and will not exceed 1,600 feet of roadway frontage.

A.1.3.9    Commercial development along SR A1A South from the St. Augustine City Limits to the Flagler County line shall be permitted only on land zoned to permit Commercial development as of the date of adoption of this Plan Amendment consistent with the uses allowed by the applicable land use designation on the Future Land Use Map, or on lands designated for Commercial on the Future Land Use Map.  Additional Commercial development on lands not zoned to permit Commercial development, or on lands not designated for Commercial on the Future Land Use Map, shall only be permitted with a Comprehensive Plan amendment to the Future Land Use Map and approved through the Planned Development land development regulations.  In evaluating such Comprehensive Plan amendment, the County shall consider each of the following:

    (a)    the proposed Commercial development is at a size and scale compatible with the surrounding area and will not cause adverse impacts to surrounding properties or the natural environment;

    (b)    adequate public facilities exist to serve the intended Commercial development;

    (c)    there is a demonstrated deficiency of other available lands designated Commercial to accommodate the proposed Commercial use, and the applicant has demonstrated that a need exists for the proposed Commercial development, based on the size, scale and population of the area being served;

    (d)    the proposed development will promote compact commercial centers or districts rather than a strip commercial development pattern, characterized by continuous linear commercial frontage along the roadway;  and

    (e)    the amendment is consistent with the policies contained in Objective A.1.5 of this Plan.

A.1.3.10    The County shall offer a residential density bonus for developments that mitigate the impacts of an existing non-conforming or incompatible land use under the provisions of the Optional Density Factors as implemented under the Land Development Regulations.

A.1.3.11    Commercial development along S.R. 206 from the Community Commercial Center at U.S. 1 eastward to the Intracoastal Waterway shall be permitted only on land zoned to permit Commercial development as of the date of adoption of this Plan Amendment consistent with the uses allowed by the applicable land use designation on the Future Land Use Map, or on lands designated for Commercial on the Future Land Use Map.  Additional Commercial development on lands not zoned to permit Commercial development, or on lands not designated for Commercial on the Future Land Use Map, shall only be permitted with a Comprehensive Plan amendment to the Future Land Use Map and approved through the Planned Development land development regulations. In evaluating such

Comprehensive Plan amendment, the County shall consider each of the following:

a)  the proposed Commercial development is at a size and scale compatible with the surrounding area and will not cause adverse impacts to surrounding properties or the natural environment;

b)  adequate public facilities exist to serve the intended Commercial development;

c)  there is a demonstrated deficiency of other available lands designated Commercial to accommodate the proposed Commercial use, and the applicant has demonstrated that a need exists for the proposed Commercial development, based on the size, scale and population of the area being served; and

d)  the proposed development will promote compact commercial centers or districts rather than a strip commercial development pattern, characterized by continuous linear commercial frontage along the roadway.

A.1.3.12   When a rezoning is considered, the County shall ensure compatibility of adjacent and surrounding land uses. Land uses, as defined in Chapter 163, Part II, Florida Statutes (Growth Management Act) include but are not limited to permitted uses, structures, and activities allowed within the land use category or implementing zoning district. Compatibility means a condition in which land uses can co-exist in relative proximity to each other in a stable fashion over time such that no use is unduly negatively impacted directly or indirectly by another use. The compatibility of land uses is dependent on numerous characteristics which may impact adjacent or surrounding uses. These include, but are not limited to: type of use, density, intensity, height, general appearance and aesthetics, odors, noise, smoke, dust, vibration, traffic generation, sanitation, litter, drainage, fire risk, air quality, protection of Listed Species or Essential Habitat, maintenance of public infrastructure, availability of potable water, sanitary sewer and other necessary public services and nuisances.

A rezoning request may be approved only upon determination that the application and evidence presented establish that all the proposed permitted uses are compatible with conforming land uses located on adjacent properties.

The Board of County Commissioners shall utilize the following criteria as applicable in the consideration of all rezoning requests.

LAND USE GOPs – As Amended 11/03/04                      PAGE A - 7

1.  A rezoning request shall not be approved if the proposed permitted uses are determined to have an unreasonable incompatible impact on the contiguous and surrounding area in respect to sensory characteristics such as odor, noise, vibration, and lighting, as well as non-sensory characteristics such as pollution and traffic flow.

2.  A rezoning request shall not be approved if the proposed traffic flow of the proposed permitted uses have an unreasonable impact on the contiguous and surrounding area, or if the proposed traffic has an unreasonable impact upon the projected wear and tear of any public roadway designed to carry lighter traffic than proposed with the rezoning, or if the proposed traffic results in an unreasonable danger to the safety of other traffic, pedestrians, and bicyclists.

3.  A rezoning request shall not be approved if any of the proposed permitted uses or proposed activities results in a public nuisance.

4.  With respect of the foregoing, the following factors may be considered in determining compatibility for all proposed rezoning requests:

    a.  permitted uses, structures and activities allowed within the Future Land Use designation;

    b.  building location, dimension, height and floor area ratio;

    c.  location and extent of parking, access drives, loading areas, and service areas;

    d.  hours of operation, noise levels, and lighting;

    e.  roads, setbacks, buffers, fences, walls, landscaping, parks and open spaces, wetlands, conservation areas, drainage ponds, lakes, and other similar characteristics that negates the incompatibility.

## The Florida Constitution

CONSTITUTION
OF THE
STATE OF FLORIDA
AS REVISED IN 1968 AND SUBSEQUENTLY AMENDED

The Constitution of the State of Florida as revised in 1968 consisted of certain revised articles as proposed by three joint resolutions which were adopted during the special session of June 24-July 3, 1968, and ratified by the electorate on November 5, 1968, together with one article carried forward from the Constitution of 1885, as amended. The articles proposed in House Joint Resolution 1-2X constituted the entire revised constitution with the exception of Articles V, VI, and VIII. Senate Joint Resolution 4-2X proposed a new proposed Article VI, relating to suffrage and elections. Senate Joint Resolution 5-2X proposed a new Article VIII, relating to local government. Article V, relating to the judiciary, was carried forward from the Constitution of 1885, as amended.

Sections composing the 1968 revision have no history notes. Subsequent changes are indicated by notes appended to the affected sections. The indexes appearing at the beginning of each article, notes appearing at the end of various sections, and section and subsection headings are added editorially and are not to be considered as part of the constitution.

PREAMBLE

We, the people of the State of Florida, being grateful to Almighty God for our constitutional liberty, in order to secure its benefits, perfect our government, insure domestic tranquility, maintain public order, and guarantee equal civil and political rights to all, do ordain and establish this constitution.

ARTICLE I   DECLARATION OF RIGHTS
ARTICLE II   GENERAL PROVISIONS
ARTICLE III   LEGISLATURE
ARTICLE IV   EXECUTIVE
ARTICLE V   JUDICIARY
ARTICLE VI   SUFFRAGE AND ELECTIONS
ARTICLE VII   FINANCE AND TAXATION
ARTICLE VIII   LOCAL GOVERNMENT
ARTICLE IX   EDUCATION
ARTICLE X   MISCELLANEOUS
ARTICLE XI   AMENDMENTS
ARTICLE XII   SCHEDULE

ARTICLE I
DECLARATION OF RIGHTS

SECTION 1.  Political power.
SECTION 2.  Basic rights.
SECTION 3.  Religious freedom.
SECTION 4.  Freedom of speech and press.

http://www.leg.state.fl.us/Statutes/index.cfm?Mode=Constitution&Submenu=3&Tab=statutes   2/14/09

SECTION 5.  Right to assemble.

SECTION 6.  Right to work.

SECTION 7.  Military power.

SECTION 8.  Right to bear arms.

SECTION 9.  Due process.

SECTION 10.  Prohibited laws.

SECTION 11.  Imprisonment for debt.

SECTION 12.  Searches and seizures.

SECTION 13.  Habeas corpus.

SECTION 14.  Pretrial release and detention.

SECTION 15.  Prosecution for crime; offenses committed by children.

SECTION 16.  Rights of accused and of victims.

SECTION 17.  Excessive punishments.

SECTION 18.  Administrative penalties.

SECTION 19.  Costs.

SECTION 20.  Treason.

SECTION 21.  Access to courts.

SECTION 22.  Trial by jury.

SECTION 23.  Right of privacy.

SECTION 24.  Access to public records and meetings.

SECTION 25.  Taxpayers' Bill of Rights.

SECTION 26.  Claimant's right to fair compensation.

SECTION 27.  Marriage defined.

SECTION 1.  Political power.--All political power is inherent in the people. The enunciation herein of certain rights shall not be construed to deny or impair others retained by the people.

SECTION 2.  Basic rights.--All natural persons, female and male alike, are equal before the law and have inalienable rights, among which are the right to enjoy and defend life and liberty, to pursue happiness, to be rewarded for industry, and to acquire, possess and protect property; except that the ownership, inheritance, disposition and possession of real property by aliens ineligible for citizenship may be regulated or prohibited by law. No person shall be deprived of any right because of race, religion, national origin, or physical disability.

History.--Am. S.J.R. 917, 1974; adopted 1974; Am. proposed by Constitution Revision Commission, Revision No. 9, 1998, filed with the Secretary of State May 5, 1998; adopted 1998.

SECTION 3.  Religious freedom.--There shall be no law respecting the establishment of religion or prohibiting or penalizing the free exercise thereof. Religious freedom shall not justify practices inconsistent with public morals, peace or safety. No revenue of the state or any political subdivision or agency thereof shall ever be taken from the public treasury directly or indirectly in aid of any church, sect, or religious denomination or in aid of any sectarian institution.

SECTION 4.  Freedom of speech and press.--Every person may speak, write and publish sentiments on all subjects but shall be responsible for the abuse of that right. No law shall be passed to restrain or abridge the liberty of speech or of the press. In all criminal prosecutions and civil actions for defamation the truth may be given in evidence. If the matter charged as defamatory is true and was published with good motives, the party shall be acquitted or exonerated.

History.--Am. proposed by Constitution Revision Commission, Revision No. 13, 1998, filed with the

punishable by life imprisonment and the proof of guilt is evident or the presumption is great, every person charged with a crime or violation of municipal or county ordinance shall be entitled to pretrial release on reasonable conditions. If no conditions of release can reasonably protect the community from risk of physical harm to persons, assure the presence of the accused at trial, or assure the integrity of the judicial process, the accused may be detained.

History.--Am. H.J.R. 43-H, 1982; adopted 1982.

SECTION 15.  Prosecution for crime; offenses committed by children.--

(a)  No person shall be tried for capital crime without presentment or indictment by a grand jury, or for other felony without such presentment or indictment or an information under oath filed by the prosecuting officer of the court, except persons on active duty in the militia when tried by courts martial.

(b)  When authorized by law, a child as therein defined may be charged with a violation of law as an act of delinquency instead of crime and tried without a jury or other requirements applicable to criminal cases. Any child so charged shall, upon demand made as provided by law before a trial in a juvenile proceeding, be tried in an appropriate court as an adult. A child found delinquent shall be disciplined as provided by law.

SECTION 16.  Rights of accused and of victims.--

(a)  In all criminal prosecutions the accused shall, upon demand, be informed of the nature and cause of the accusation, and shall be furnished a copy of the charges, and shall have the right to have compulsory process for witnesses, to confront at trial adverse witnesses, to be heard in person, by counsel or both, and to have a speedy and public trial by impartial jury in the county where the crime was committed. If the county is not known, the indictment or information may charge venue in two or more counties conjunctively and proof that the crime was committed in that area shall be sufficient; but before pleading the accused may elect in which of those counties the trial will take place. Venue for prosecution of crimes committed beyond the boundaries of the state shall be fixed by law.

(b)  Victims of crime or their lawful representatives, including the next of kin of homicide victims, are entitled to the right to be informed, to be present, and to be heard when relevant, at all crucial stages of criminal proceedings, to the extent that these rights do not interfere with the constitutional rights of the accused.

History.--Am. S.J.R. 135, 1987; adopted 1988; Am. proposed by Constitution Revision Commission, Revision No. 13, 1998, filed with the Secretary of State May 5, 1998; adopted 1998.

SECTION 17.  Excessive punishments.--Excessive fines, cruel and unusual punishment, attainder, forfeiture of estate, indefinite imprisonment, and unreasonable detention of witnesses are forbidden. The death penalty is an authorized punishment for capital crimes designated by the legislature. The prohibition against cruel or unusual punishment, and the prohibition against cruel and unusual punishment, shall be construed in conformity with decisions of the United States Supreme Court which interpret the prohibition against cruel and unusual punishment provided in the Eighth Amendment to the United States Constitution. Any method of execution shall be allowed, unless prohibited by the United States Constitution. Methods of execution may be designated by the legislature, and a change in any method of execution may be applied retroactively. A sentence of death shall not be reduced on the basis that a method of execution is invalid. In any case in which an execution method is declared invalid, the death sentence shall remain in force until the sentence can be lawfully executed by any valid method. This section shall apply retroactively.

History.--Am. H.J.R. 3505, 1998; adopted 1998; Am. H.J.R. 951, 2001; adopted 2002.

SECTION 18.  Administrative penalties.--No administrative agency, except the Department of Military



**FindLaw** ®
Legal News and Commentary

http://writ.news.findlaw.com/hamilton/20050602.html



# The Supreme Court's New Ruling on the Religious Land Use and Institutionalized Persons Act's Prison Provisions: Deferring Key Constitutional Questions

**By MARCI HAMILTON**
hamilton02@aol.com
----

Thursday, Jun. 02, 2005

Recently, in *Cutter v. Wilkinson*, the Supreme Court unanimously upheld the prison provisions of the Religious Land Use and Institutionalized Persons Act (RLUIPA) - against a challenge arguing that these provisions violate the Establishment Clause.

It would be a mistake, however, to count this as an outright loss for prisons when it comes to RLUIPA. Even as the Court upheld these provisions, it also interpreted them, in the context of legislative history, to require significant deference to prison authorities' judgment.

Moreover, RLUIPA, as a whole, is not out of the woods yet. Its land use provisions - which I described in an earlier column - were not at issue here, nor did the Court presage how it might rule on their constitutionality.

Also, a key constitutional question about the congressional power to enact the provisions of RLUIPA has yet to be decided. In addition to considering the Establishment Clause challenge, the Court could have considered the question whether Congress had the proper constitutional authority to enact RLUIPA in the first place. On this question, however, it sent the case back to the appeals court - here, the U.S. Court of Appeals for the Sixth Circuit.

## RLUIPA's Formula: Applying "Strict" Scrutiny to Even Neutral, General Regulations

By its terms, RLUIPA imposes the long-standing constitutional test known as "strict scrutiny" to prison regulations (and those of other government-run institutions). To survive "strict scrutiny," prison officials must carry their burden of proving that their regulations exist to serve a compelling interest.

Traditionally, this has been a very hard burden to carry: Strict scrutiny has often been called "strict in practice, fatal in fact." Put another way, as the Supreme Court explained in its 2004 free exercise decision in *Locke v. Davey*, which upheld the exclusion of students training for the ministry from a state-funded scholarship program, strict scrutiny stands for the proposition that the law is "presumptively unconstitutional."

Remarkably, in RLUIPA, Congress required courts to apply "strict scrutiny" even to neutral, generally applicable regulations - regulations that do not even mention religion. In other words, RLUIPA directs courts to treat neutral regulations as inherently suspect.

The reason this is remarkable is that under Court doctrine, strict scrutiny has normally been triggered only when there is a strong reason to suspect that the government has violated the Constitution. With few exceptions, in the free exercise context, strict scrutiny was normally reserved to laws that target religious entities for negative treatment, as in the *Church of Lukumi Babalu Aye* decision, which held that the City of Hialeah could not target the Santerians' sacrificial disposal of animals.

To apply strict scrutiny to neutral, generally applicable laws is a new formulation.

## The Problem with Applying Strict Scrutiny in the Prison Context

Applying strict scrutiny, as it is normally understood, to neutral regulations puts prisons in an untenable position. They are dealing with a myriad of difficult issues, including security, gang violence, and tight budgets, and courts need to defer to their judgment, which is informed by up-close knowledge.

As the Court has recognized in prison Free Exercise cases such as *Turner v. Safley* and *O'Lone v. Estate of Shabazz,* prison authorities deserve leeway in figuring out what interests are important enough that they must overcome inmate Free Exercise claims. There, it has employed standards of review lower than strict scrutiny - opting for either "rational basis" review, or intermediate-level scrutiny.

It was unwise for Congress, with RLUIPA, to increase the standard to "strict scrutiny" review after the Court had wisely decided lower standards were proper.

## The Court's Opinion: Strict Scrutiny Should Incorporate Deference to Prisons

As noted above, the Court upheld RLUIPA's prison provisions against Establishment Clause attack. That means the "strict scrutiny" standard, at least in name, still applies in the prison context.

But the Court also did something interesting: It held that this high standard should be interpreted by courts to encompass deference to prison officials' judgments.

Justice Ginsburg, writing for the Court, repeatedly emphasized this point - citing legislative history that instructed courts to apply RLUIPA with "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources."

In a footnote, Justice Ginsburg re-emphasized this point, writing for the Court that "It bears repetition . . . that prison security is a compelling state interest, and that deference is due to institutional officials' expertise in this arena." And she ended her opinion for the Court by noting that "Should inmate requests for religious accommodations become excessive, impose unjustified burdens on other institutionalized persons, or jeopardize the effective functioning of an institution, the facility should be free to resist the imposition."

The Court's message, then, is clear: RLUIPA's prison provisions are to be applied in an "appropriately balanced way," not in a way that presumes the prison's policies are illegal or unconstitutional.

RLUIPA, then, does not require the sort of strict scrutiny that has been mandated in affirmative action cases like *Richmond v. Croson* or the content-based speech cases like *Boos v. Barry*. In the prison/religious freedom context, strict scrutiny is not to be "strict in theory, fatal in fact." Far from it: Strict scrutiny, here, will be strict in theory, *deferential* in fact. In all likelihood, in practice, it will be something like the intermediate scrutiny counseled in *Turner v. Safley*.

## The Court's Decision to Reject Traditional Strict Scrutiny Here Is Unsurprising

Court-watchers should have expected a result something like this. Strict scrutiny of neutral, generally applicable laws is simply indefensible and unworkable: Why should - and how can - laws that do not expressly discriminate or bear any other earmark of governmental unconstitutional conduct, be deemed presumptively unconstitutional? Such a presumption only could come from some noxious aspect of the law's wording or structure; yet by definition general, neutral laws lack any such aspect.

No wonder then that (contrary to some of my academic colleagues' claims, and those of many religious lobbyists) the Supreme Court has never been devoted to strict scrutiny in the free exercise context. Very few free exercise cases have invoked it, and even fewer apply it to the advantage of the believer.

*Sherbert v. Verner* held that a Sabbatarian could not be denied unemployment compensation for failing to work on Saturdays when others could be excused from work on secular grounds. There, religious reasons were being treated less favorably than secular reasons, making the government's denial suspect, as the Court pointed out in *Locke*.

The one case where the Court applied strict scrutiny to a neutral, generally applicable law with fervor is *Wisconsin v. Yoder*. But that decision -- which held that Wisconsin's compulsory education law could be avoided by the Amish because their interest in an insular community outweighed any interest the state might have in an educated citizenry -- is an aberrant mistake. Indeed, it's probably the worst Free Exercise opinion the Court has ever issued.

## *Cutter* Shows the Court's Greater Willingness to Allow Broad Accommodation

In sum, it should have been expected that the Court would not permit RLUIPA, if it were to be upheld, to stand for the proposition that prison regulations are presumptively illegal. But one aspect of *Cutter* is genuinely new - and, perhaps, a bit surprising. *Cutter* seems to evidence a more expansive willingness, on the part of the Court, to permit religious accommodation well beyond practice-specific accommodation.

In *Employment Division v. Smith*, the Court blessed practice-specific accommodations when it suggested that although the Free Exercise Clause did not mandate an exemption from the narcotics laws for the use of peyote in religious ceremonies, legislatures could constitutionally create an express exception for such use. Similarly, in *Corporation of Presiding Bishop v. Amos*, the Court upheld an express exception to Title VII - the main federal anti-discrimination statute - in which Congress allowed religious entities to hire co-religionists (even for non-religious positions) without fear of legal liability.

Still, *Amos* hardly prepared the way for RLUIPA or *Cutter*. The Title VII exemption at issue applied only in the context of employment discrimination claims based on alleged religious discrimination: It did not create an exception to gender or race discrimination claims, let alone to all employment law claims. Instead, it simply mandated that courts dismiss a certain, narrow category of lawsuit: A religious discrimination lawsuit, where the dispute arises out of the institution's insistence on employing one who shares the institution's beliefs.

By comparison, RLUIPA is much broader. It covers two entire arenas of law: institutional regulations and land use regulations - and that means it covers a lot of territory, many issues, and will be controlling law when it comes to the resolution of a lot of currently unknowable future problems. The supposed "three years" of hearings on the statute in fact included only a handful of individuals testifying on behalf of religious groups, and no state prison administrators. Thus, Congress passed this law having virtually no real knowledge about its impact, or its consistency with the public good, in the vast majority of its applications. It is, in a word, blind accommodation.

But the Court did not take as its basis for comparison the narrow Title VII exception in *Amos*. Instead, it opted to compare RLUIPA with its much broader predecessor, the Religious Freedom Restoration Act (RFRA). And, as I pointed out in a recent column on the *Cutter* oral argument, in comparison to RFRA, RLUIPA looks quite nicely tailored.

RFRA imposed strict scrutiny on every single law in the country, as applied to religious institutions and persons. No wonder, then, that the Court struck it down as unconstitutional (at least as it applied to the states) in *Boerne v. Flores*. RFRA is such a problematic statute, it should not be the benchmark for constitutional accommodation.

Thus, just as *Boerne* suggested that immensely broad religious exemptions must fail, *Cutter* suggests that religious exemptions can succeed even if they are broader than any we've seen in the past. This is new territory, which unfortunately gives legislatures little incentive to investigate how their exemptions will in fact affect the public good.

## The Court Has Yet to Rule on RLUIPA's Land Use Provisions

As I noted above, the Court has yet to rule on the constitutionality of RLUIPA's land use provisions. And the issue, there, is quite different.

As Justice Ginsburg noted, prisons have complete control over worship and religious observance, putting prisoners in a potentially vulnerable position. On this score, the opinion finds the prison provisions consistent with the Establishment Clause, because they operate in an arena where "the government exerts a degree of control unparalleled in civilian society and severely disabling to private religious exercise." RLUIPA "alleviates

*exceptional* government-created burdens on private religious exercise." The Court's willingness, in *Cutter*, to allow Congress leeway to protect observance with a higher standard of scrutiny (yet still a deferential one) is thus understandable. The prison provisions go to the very core of religious exercise - worship.

But on the land use side, there is <u>no</u> reason to think religious institutions - often well-funded, and with a strong supporting constituency inside and outside the community -- are especially vulnerable. Moreover, what is protected by RLUIPA is not their religious observance; it is merely their ability to legally enforce their preferences regarding location and buildings.

A church's ability to preach its own doctrine is sacrosanct, but its ability to expand its parking lot in a residential neighborhood, despite contrary zoning provisions, certainly is not. And giving churches - but not, say, secular day care centers or battered women's shelters - parking lot expansion privileges, looks a lot like the establishment of religion.

For these reasons, the Court may well find the Establishment Clause arguments for striking down RLUIPA's land use provisions are far more compelling than the Establishment Clause arguments for striking down its prison counterpart.

And remember, the issue of the very basis of Congress's power to enact RLUIPA has been deferred. Justice Thomas, in a concurrence, makes it clear that there are serious reasons to doubt whether Congress has the power to enact RLUIPA. The federal government is a government of enumerated powers, and RLUIPA's proponents must explain how this law - a law governing state and local governments, for the sake of religious entities -- is a valid exercise of federal power under the Spending or Commerce Clauses, or Section 5 of the <u>Fourteenth Amendment</u>.

On this issue, we'll hear from the Sixth Circuit in the prison context before we hear from the Supreme Court. On the land use side, this question is an especially weighty one: Federalism concerns are at their height when a federal law interferes with what is the most inherently state and local issue: local land use.

So stay tuned, because there is much left to be decided with respect to RLUIPA.

*Marci A. Hamilton is the Paul R. Verkuil Chair in Public Law at Benjamin N. Cardozo School of Law, Yeshiva University. An archive of her columns on First Amendment and other constitutional issues can be found on this site. Her email address is hamilton02@aol.com. Professor Hamilton's book, God vs. the Gavel: Religion and the Rule of Law (Cambridge University Press 2005) will be available in June.*

Company | Privacy Policy | Disclaimer

Copyright © 1994-2009 FindLaw

**The New York Times**
nytimes.com



PRINTER-FRIENDLY FORMAT
SPONSORED BY

October 8, 2006

IN GOD'S NAME

# As Exemptions Grow, Religion Outweighs Regulation

By DIANA B. HENRIQUES

**Correction Appended**

At any moment, state inspectors can step uninvited into one of the three child care centers that Ethel White runs in Auburn, Ala., to make sure they meet state requirements intended to ensure that the children are safe. There must be continuing training for the staff. Her nurseries must have two sinks, one exclusively for food preparation. All cabinets must have safety locks. Medications for the children must be kept under lock and key, and refrigerated.

The Rev. Ray Fuson of the Harvest Temple Church of God in Montgomery, Ala., does not have to worry about unannounced state inspections at the day care center his church runs. Alabama exempts church day care programs from state licensing requirements, which were tightened after almost a dozen children died in licensed and unlicensed day care centers in the state in two years.

The differences do not end there. As an employer, Ms. White must comply with the civil rights laws; if employees feel mistreated, they can take the center to court. Religious organizations, including Pastor Fuson's, are protected by the courts from almost all lawsuits filed by their ministers or other religious staff members, no matter how unfairly those employees think they have been treated.

And if you are curious about how Ms. White's nonprofit center uses its public grants and donations, read the financial statements she is required to file each year with the Internal Revenue Service. There are no I.R.S. reports from Harvest Temple. Federal law does not require churches to file them.

Far more than an hourlong stretch of highway separates these two busy, cheerful day care centers. Ms. White's center operates in the world occupied by most American organizations.

As a religious ministry, Pastor Fuson's center does not.

In recent years, many politicians and commentators have cited what they consider a nationwide "war on religion" that exposes religious organizations to hostility and discrimination. But such organizations — from mainline Presbyterian and Methodist churches to mosques to synagogues to Hindu temples — enjoy an abundance of exemptions from regulations and taxes. And the number is multiplying rapidly.

Some of the exceptions have existed for much of the nation's history, originally devised for Christian churches but expanded to other faiths as the nation has become more religiously diverse. But many have been granted in just the last 15 years — sometimes added to legislation, anonymously and with little attention, much as are the widely criticized "earmarks" benefiting other special interests.

An analysis by The New York Times of laws passed since 1989 shows that more than 200 special arrangements, protections or exemptions for religious groups or their adherents were tucked into Congressional legislation, covering topics ranging from pensions to immigration to land use. New breaks have also been provided by a host of pivotal court decisions at the state and federal level, and by numerous rule changes in almost every department and agency of the executive branch.

The special breaks amount to "a sort of religious affirmative action program," said John Witte Jr., director of the Center for the Study of Law and Religion at the Emory University law school.

Professor Witte added: "Separation of church and state was certainly part of American law when many of today's public opinion makers were in school. But separation of church and state is no longer the law of the land."

The changes reflect, in part, the growing political influence of religious groups and the growing presence of conservatives in the courts and regulatory agencies. But these tax and regulatory breaks have been endorsed by politicians of both major political parties, by judges around the country, and at all levels of government.

"The religious community has a lot of pull, and senators are very deferential to this kind of legislation," said Richard R. Hammar, the editor of Church Law & Tax Report and an accountant with law and divinity degrees from Harvard.

As a result of these special breaks, religious organizations of all faiths stand in a position

that American businesses — and the thousands of nonprofit groups without that "religious" label — can only envy. And the new breaks come at a time when many religious organizations are expanding into activities — from day care centers to funeral homes, from ice cream parlors to fitness clubs, from bookstores to broadcasters — that compete with these same businesses and nonprofit organizations.

Religious organizations are exempt from many federal, state and local laws and regulations covering social services, including addiction treatment centers and child care, like those in Alabama.

Federal law gives religious congregations unique tools to challenge government restrictions on the way they use their land. Consequently, land-use restrictions that are a result of longstanding public demands for open space or historic preservation may be trumped by a religious ministry's construction plans, as in a current dispute in Boulder County, Colo.

Exemptions in the civil rights laws protect religious employers from all legal complaints about faith-based preferences in hiring. The courts have shielded them from many complaints about other forms of discrimination, whether based on race, nationality, age, gender, medical condition or sexual orientation. And most religious organizations have been exempted from federal laws meant to protect pensions and to provide unemployment benefits.

Governments have been as generous with tax breaks as with regulatory exemptions. Congress has imposed limits on the I.R.S.'s ability to audit churches, synagogues and other religious congregations. And beyond the federal income tax exemption they share with all nonprofit groups, houses of worship have long been granted an exemption from local property taxes in every state.

As religious activities expand far beyond weekly worship, that venerable tax break is expanding, too. In recent years, a church-run fitness center with a tanning bed and video arcade in Minnesota, a biblical theme park in Florida, a ministry's 1,800-acre training retreat and conference center in Michigan, religious broadcasters' transmission towers in Washington State, and housing for teachers at church-run schools in Alaska have all been granted tax breaks by local officials — or, when they balked, by the courts or state legislators.

These organizations and their leaders still rely on public services — police and fire protection, street lights and storm drains, highway and bridge maintenance, food and drug inspections, national defense. But their tax exemptions shift the cost of providing those

benefits onto other citizens. The total cost nationwide is not known, because no one keeps track.

## When Values Collide

Few Americans dispute the value of protecting religious liberty. The framers of the Constitution opened the First Amendment of the Bill of Rights with language preserving religious freedom with two clear goals in mind, constitutional scholars agree.

First, they wanted to assure that everyone, even members of small and possibly unpopular sects, could practice their faith without fearing the kind of persecution that many had experienced in their home countries, where a dominant religion was allied with the state. Just as important, the framers wanted to prevent the government from ever being captive to a particular religion or set of beliefs at the expense of people of other faiths.

Over the last two centuries, many scholars say, this tradition of religious freedom and tolerance, a radical concept in the 18th century, has helped this country avoid the spasms of sectarian violence that have erupted in countries from Ireland to India and attracted immigrants bringing talents from across the world.

Some legal scholars and judges see the special breaks for religious groups as a way to prevent government from infringing on those religious freedoms.

"Never forget that the exercise of religion is a constitutionally protected activity," said Douglas Laycock, a law professor at the University of Michigan who has written and testified in support of greater legislative protection for religious liberty. "Regulation imposes burdens on the free exercise of religion. Exemptions lift those burdens." He added, "That is constitutionally a good thing."

Precious as protecting religious freedom is, however, there are cases where these special breaks collide with other values important in this country — like extending the protections of government to all citizens and sharing the responsibilities of society fairly.

Religious organizations defend the exemptions as a way to recognize the benefits religious groups have provided — operating schools, orphanages, old-age homes and hospitals long before social welfare and education were widely seen as the responsibility of government.

But while ministries that run soup kitchens and homeless shelters benefit from these exemptions, secular nonprofits serving the same needy people often do not. And rather than

just rewarding charitable works that benefit society, these breaks are equally available to religious organizations that provide no charitable services to anyone.

Similarly, religious nonprofit groups that run nationwide broadcasting networks, produce best-selling publications or showcase a charismatic leader's books and speeches can take advantage of exemptions that are not available to secular nonprofit groups — not to mention for-profit companies — engaged in the same activities.

Any government oversight of religious groups must fit within the First Amendment's command that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."

For most of the past half-century, courts interpreted the first part of that clause as a barrier to government action that seemed to treat religious groups more favorably than secular ones, legal scholars said. But today, many lawyers agree, courts are taking a more accommodating view of government actions that benefit religious groups.

The willingness of the federal courts to accept these arrangements increased considerably under the influence of William H. Rehnquist when he was chief justice of the Supreme Court, said Derek H. Davis, until recently the director of the J. M. Dawson Institute of Church-State Studies at Baylor University in Waco, Tex.

"Clearly, we're going to be in this accommodative mode for some time," added Mr. Davis, who sees Chief Justice Rehnquist's successor, Chief Justice John G. Roberts Jr., and Justice Samuel A. Alito Jr. as likely to follow in Chief Justice Rehnquist's footsteps on cases affecting religious groups.

The problem is, efforts to protect the free exercise of religion can clash with efforts to assure that religion is not favored by the government.

Besides regulatory exemptions and special tax breaks, some of which have been in place for decades, religious organizations have recently become eligible for an increasing stream of federal grants and contracts from state and federal governments. This policy shift began in 1996 under President Clinton, and has continued with greater force under President Bush. Known in the Bush administration as the Faith Based Initiative, it has drawn considerable attention in political, religious and academic circles.

But the broader tapestry of regulatory and tax exemptions for religious groups has gone largely unacknowledged. Indeed, some religious leaders and politicians — focusing not on

these special accommodations but on issues like the display of religious icons on public land — argue that religious groups in America are targets of antagonism, not favoritism. House Speaker J. Dennis Hastert of Illinois, in introducing a legislative agenda last July, said, "Radical courts have attempted to gut our religious freedom and redefine the value system on which America was built."

In March, hundreds of people and a number of influential lawmakers attended a conference called "The War on Christians and the Values Voter in 2006" in Washington and applauded the premise that religion was under attack.

Society "treats Christianity like a second-class superstition," Tom DeLay, then a Republican representative from Texas, told the crowd. "Seen from that perspective, of course there is a war on religion."

The argument that religious groups are victims of discrimination drew a sigh from Ms. White, the day care director in Alabama, where licensed day care centers are finding it harder to compete with unlicensed faith-based centers that do not have to comply with expensive licensing requirements.

James E. Long, a deputy attorney general for Alabama's department of human resources, acknowledged that licensed day care operators have complained time and again that the exemption is unfair. "But I am unaware of any bill ever having been introduced" that would eliminate it, Mr. Long said. "That would be a very contentious issue. I'm sure the churches would want to be heard on that."

Breaks for Social Services

On an early summer day at the Harvest Temple Church of God in Montgomery, a lively group of older children tossed soccer balls around a dim, cool gymnasium. In a smaller room to the side, staff members rocked sleeping infants and comforted cranky toddlers.

This bustling church-based center, next to the church sanctuary in a well-tended middle-class neighborhood, covers its costs and helps support the work of the church, the church pastor said.

"We have talked about getting licensed before in the past, but it would cost us quite a bit of money," Pastor Fuson said. The staff would probably be large enough to meet state standards, he said, but the center would need costly renovations to upgrade the facilities.

Ms. White, whose licensed program, Auburn Daycare Centers, has become nationally accredited during her tenure, understands how demanding the state requirements are. Her centers in Auburn have to comply with them, down to the specific toys required for each age group.

As in many states, these regulations were a response to conditions that had put young lives at risk. In Alabama alone, almost a dozen children died in day care facilities in the two years before the state began upgrading its licensing requirements in 2000.

Ms. White said the root problem in Alabama is that there is not enough state aid for working families who need good day care. But given the state's limited resources, she said, it seems unfair that subsidies are available to unlicensed centers as well as licensed ones — a view shared by the Federation of Child Care Centers of Alabama, which has lobbied for greater financing and universal licensing.

Some churches in Alabama have voluntarily obtained licenses. The Rev. Paul B. Koch Jr., of First Christian Church in Huntsville, whose day care center is licensed, thinks licensing for such programs is appropriate and raises the quality of care. "But the Christian Coalition is still strong in Alabama and this is an issue for them," he said.

John W. Giles, president of the state's Christian Coalition, confirmed that his organization supported the exemption, noting that state oversight would be intrusive and was unnecessary "because the pastors and congregations are your quality control." Although most of the unlicensed centers are run by Protestant churches or ministries, the exemption covers all faiths, from an Islamic preschool program in Huntsville to a Catholic parish center in Tuscaloosa.

Eleven other states — including Utah, Maryland, Illinois and Florida — also have exempted religious child care programs from at least some of the rules that apply to other nonprofit programs, according to the National Child Care Information Center in Fairfax, Va.

One state that has dropped off that list is Texas.

In 1997, George Bush, who was the governor, pushed through legislation that exempted faith-based day care centers and addiction treatment programs from state licensing, allowing them to be monitored instead by private associations controlled by pastors, program directors and other private citizens. Other laws enacted on his watch steered more state financing to these "alternatively accredited" institutions.

Fewer than a dozen child care centers and about 130 addiction treatment programs took advantage of this new alternative, according to subsequent studies. But several of these later became the focus of state investigations into complaints of physical abuse. A study by the Texas Freedom Network Education Fund, a nonprofit research organization that opposed the faith-based initiatives, found that "the rate of confirmed cases of abuse and neglect at alternatively accredited facilities in Texas is more than 10 times that of state-licensed facilities."

In spring 2001, the Texas Legislature quietly allowed the alternative accreditation program for day care centers to lapse.

Two leading First Amendment scholars, asked about faith-based day care licensing exemptions like these, said they were unfamiliar with the practice but thought it sounded legally dubious. "I think what you describe is unconstitutional," said Ira C. Lupu, a law professor at George Washington University and the co-director of legal research for the Roundtable on Religion and Social Welfare Policy, an independent project of the Rockefeller Institute of Government.

Professor Witte, the director of Emory University's Center for the Study of Law and Religion, said in an e-mail response that he "would frankly be surprised to find even this Supreme Court going that far."

However, when a group of licensed day care centers challenged the Alabama law in a federal court in mid-2001, arguing that it deprived them of their constitutional right to equal protection before the law, the group lost.

Judge Myron H. Thompson of United States District Court, who ruled on the case, said the state could have adopted the arrangement to avoid church-state entanglements or simply to accommodate the free exercise of religion. Indeed, he cited four other federal cases, all decided since 1988, that had upheld similar exemptions for day care centers in other states.

In Judge Thompson's view, it is "well settled" constitutional law that "the possible economic inequalities that might result from religious exemptions such as day care licensing exemptions" are not a violation of anyone's equal-protection rights.

Exemptions From Zoning Rules

"When you fly in to Denver at night, you can always pick out Boulder," said Ben Pearlman, an athletic young lawyer who grew up there. "It's the only one with big patches of darkness

around it."

As one of Boulder County's three governing commissioners, the soft-spoken Mr. Pearlman talks about protecting the county's spectacular beauty as if it were a sacred trust. In 1978, the county limited intensive development to already urbanized areas, buffered by large swaths of prairie and farmland. The landscape therefore now stands in stark contrast to the spreading carpet of subdivisions, office parks and malls in neighboring counties around Denver.

To Alan Ahlgrim, the mellow and mesmerizing preacher who founded Rocky Mountain Christian Church in eastern Boulder County in 1984, those encroaching subdivisions look like spiritual vineyards, full of families ready to be transformed by his church's call for them to become "blessed to be a blessing" to others.

"The church has never grown fast enough to suit me," Pastor Ahlgrim said with a grin that showed he was almost, but not quite, serious.

But the church, one of more than 200 in the county, did grow fast enough in the last 22 years — from about three dozen families in 1984 to more than 2,200 people today — to burst from its original building and five subsequent expansions approved by the county.

Today, its enthusiastic young congregation is once again bumping up against the walls of its 106,000-square-foot home, which sits on 55 acres in an agricultural buffer zone around the small town of Niwot. It is holding multiple services to handle the overflow congregation, but its Sunday school space is full, with some classes spilling out into hallways and temporary buildings set up in a parking lot.

Yet church members cringe at the notion of turning away newcomers. "Who do you say no to? Do you hang a 'no vacancy' sign out front?" asked Guy Scoma, a young father who visited the church as a lonely widower and stayed on when he met, then married, his wife, Kaarin.

The church wants to almost double the size of its facilities so it can accommodate up to 4,500 people. The church could then provide a new children's wing, more rooms for adult classes and a gymnasium with room for two basketball courts or potluck suppers for 1,000. The new wings, linked to the existing building by spacious galleries, would be surrounded by more than 1,200 landscaped parking spaces, 60 percent more than today.

But the county's land-use plan and zoning rules for the agricultural buffer zone where the church stands would limit any construction on the site to a single residential building. So

the church cannot build without the approval of the Boulder County commissioners. And in February, after an emotional public hearing attended by more than a thousand people, Mr. Pearlman and his two fellow commissioners said no.

"People are always trying to develop their properties to the limits of the law and sometimes beyond," Mr. Pearlman said. But the worst suburban sprawl is the consequence of "lots of little decisions that have this cumulative effect," he continued. "We're trying to resist this death by a thousand cuts, and preserve the land where we can."

Like the leaders of large, fast-growing churches across the country confronting zoning restrictions on their expansion plans, Pastor Ahlgrim is unhappy. The decision "is severely restrictive to our mission," he said. Like worshiping, teaching and gathering for fellowship, the practice of sharing with the community — in this case, allowing certain outside groups to use the church when it's available — is "vital to our mission," he continued. "When one of your core values is generosity and you are restricted from sharing what you want to share — what God has provided — we consider that to be a severe limitation."

The church had no choice but to go to court, he said.

The church has sued the county under a federal land-use law enacted by Congress and signed by Bill Clinton in 2000 to protect religious organizations from capricious or discriminatory zoning restrictions by local governments. The unusual law came after a decade-long bipartisan tug-of-war between Congress and the Supreme Court.

Before 1990, the court had generally held that any government restriction on religion must serve a compelling public interest in the least burdensome way — a standard known as the "strict scrutiny" test. But in one Oregon case dealing with two Native Americans' sacramental use of peyote, an illegal drug, the majority concluded that there was nothing unconstitutional about states expecting citizens to comply with valid, neutral and generally applicable laws — like those criminalizing peyote — even if compliance conflicted with religious beliefs.

This "Smith decision," Employment Division v. Smith, provoked a fierce reaction that has energized the drive for more legislative protections for religion ever since. In 1993, under pressure from a broad coalition whose members ranged from the Anti-Defamation League to the Southern Baptist Convention to the American Humanist Association, Congress adopted the Religious Freedom Restoration Act, which restored the "strict scrutiny" test to any federal, state or local government action affecting religious practice. A new tool had been added to the First Amendment emergency kit, although no one was quite sure how to

use it.

Then the Supreme Court tugged back. In 1997, it ruled that the religious freedom act could not be applied constitutionally to the states. In reaction, 13 states have subsequently adopted similar measures of their own. But Congress thought the decision left room for it to address zoning restrictions and, separately, religious restrictions imposed on prisoners.

In 2000 Congress adopted and Mr. Clinton signed the Religious Land Use and Institutionalized Persons Act, which restored the "strict scrutiny" test to local zoning decisions, making it easier for churches to challenge those decisions in court. The act also made it easier for prisoners to challenge restrictions on their religious practices.

The provisions that apply to prisoners have been upheld, but the Supreme Court has not yet ruled on the land-use provisions that Rocky Mountain Christian Church is invoking in its lawsuit against Boulder County. One of the church's allies in the fight is the Justice Department's civil rights division, which is defending the law's constitutionality in cases around the country.

Defenders of the law say that some cases invoking its protections have addressed actions by local governments that seem to reflect blatant religious bias. For example, Rabbi Joseph Konikov of Orlando, Fla., successfully sued his local government under the law in 2002 after county officials repeatedly cited and fined him for holding small worship services in his suburban home, in violation of a zoning provision later found to be an unconstitutional burden on religious freedom.

"It was like Communist Russia," said Rabbi Konikov, who said his grandfather had fled the Soviet Union to escape religious oppression. He has continued to hold services in his home. "It was very satisfying to see that, at the end, our Constitution and our American values and freedoms came through for us."

Other zoning challenges, all invoking the 2000 law, have been filed by a Sikh society that wants to build a temple in a low-density residential area of Yuba City, Calif.; a Hindu congregation seeking permission to expand its temple and cultural center on a busy highway in Bridgewater, N.J.; and a Muslim organization that has been trying for years to build a mosque on land that the local government in Wayne Township, N.J., now wants to buy for open space.

Seeking a Protective Balance

Critics of the 2000 law argue that the First Amendment itself has long prohibited religious discrimination in zoning, and that such zoning decisions could have been challenged just as successfully in the courts if the law had never been passed.

When Congress considered the law, "what was actually being discussed was 'How do we make sure churches don't get discriminated against,' " said Marci A. Hamilton, a law professor at the Benjamin N. Cardozo School of Law at Yeshiva University in Manhattan and the author of "God vs. The Gavel: Religion and the Rule of Law" (Cambridge University Press, 2005), which calls for closer scrutiny of some religious exemptions, especially those affecting land use and family law.

"Unfortunately, the answer was to give such an expansive remedy that not only are they not getting discriminated against, but they are now capable of discriminating against all other landowners," added Professor Hamilton, who is advising Boulder County in its case.

The financial stakes in the Boulder lawsuit are large.

Under the 2000 law, if the county loses, it will have to pay not only its own legal bills but also those of the church. If the church loses, it will sacrifice the money it has spent on legal, architectural and public relations fees, but it will not be required to pay the county's legal bills. And unlike the county, it could seek free legal help from various religious advocacy groups, although it has not yet done so.

While a county victory might provide other local governments with a template for defending against similar challenges, some lawyers fear that if Boulder County, with its long history of careful land-use planning and its environmentally demanding voters, cannot successfully argue that preserving open space is a "compelling public interest," few local governments could.

"Religious institutions have realized that land-use authorities are vulnerable to the threat of litigation," David Evan Hughes, the deputy county attorney, asserted in the county's court filings. Without greater clarity from the courts, he continued, the new law's reach "will expand to the point where religious institutions are effectively dictating their own land-use regulations."

Like most Boulder County residents, several church members said they cherish the open space preserved by the county's past land-use decisions. But they think the county was wrong to reject the church's proposal.

Lanny Pinchuk, a church member who formerly served on the county planning board, praised all that the county has done to preserve the environment. "But you can't keep people from coming to the religious institution of their choice," he said. "I feel that is just, well, un-American."

Church leaders and members said their current proposal was the "forever plan," the last expansion the church would make on this site.

But they all struggled to explain why it is an unconstitutional burden for them to have to turn away newcomers now when, if they continue to grow, they will inevitably have to turn away people when their "forever" building is full.

"At some point, we're going to have to say we can't accommodate any more; I mean, we're not going to have a 100-story building over there," said Gerry Witt, a founding church member who has recently put his house on the market so he and his wife, Carole, can move to a less developed area on the western slope of the Rockies.

"So is there any limit?" He thought a moment, then answered his question. "Yes," he said. "There's God's limit. When he says, 'You're at your limit,' that's when we will stop."

*Andrew Lehren conducted computer analysis for this series, and Donna Anderson provided online research assistance.*

**Correction: Oct. 10, 2006**

*A front-page article on Sunday about the expansion of legal exemptions for religious organizations referred imprecisely to the academic credentials of Richard R. Hammar, a lawyer and accountant specializing in church law and taxation who discussed the political influence of the religious groups. Although Mr. Hammar attended the Harvard Divinity School, he does not have a divinity degree.*

Copyright 2006 The New York Times Company

*SJC Commission Offi...*

FEB 2 0 2009

431 Cheryl Court
St. John's, Florida 32259
February 17, 2009

Mr. Phillip Mays
St. Johns County Board of Commissioners
500 San Sebastian Way
St. Augustine, Florida 32085

Dear Mr. Mays,

I am a 20 year resident of Fruit Cove. I worship at St. Patrick's Episcopal Church on
State Road 13. As you may know by now, an issue is to come before you concerning a
Stealth Tower to be built on our property by Anchor Tower.

The purpose of this tower is to improve cell service to the residents of Northwest St.
Johns County. Two companies have committed to renting space from this tower already,
and it can hold up to six tenants. The taxable rental income will help sustain our church
and provide for our future.

The tower is not the kind of contraptions you might envision. It is a Stealth Tower,
meaning that all the mechanics are enclosed within the vertical pole. To make it even
more attractive, Anchor has offered to put up a crossbeam so that it will be a Christian
Cross symbol. The location is on the far Northeast corner of our property, well back
from the road, surrounded by tall pine trees which will obstruct most of the view of the
tower and all of its base. It will not be lighted, it will not be a bird perch---it's actually
going to be attractive!

Mr. Mays, nearly all our members are residents of the immediate community here in St.
John's. We see this as a positive move for our church and for all residents of the area.
We trust you will support us when this petition comes before you.

As I am sure you have not had time to visit all areas of the county in your new position, if
you would like to meet me at the church to see for yourself exactly where this is going to
be, I'd be delighted to meet with you.

Sincerely,

*Linda McClelland*

Linda McClelland
(cell) 904-651-7032

R E C E I V E D

MAR - 9 2009

ZONING DEPARTMENT
ST. JOHNS COUNTY

ROUTING TO:
DIST. 1 _____
DIST. 2 _____
DIST. 3 _____
DIST. 4 _____
DIST. 5 _____
ALL      X _____



RECEIVED
MAR - 9 2009
ZONING DEPARTMENT
ST. JOHNS COUNTY

ROUTING TO:
DIST. 1
DIST. 2
DIST. 3
DIST. 4
DIST. 5 ✓
ALL

SJC Commission Office

FEB 2 5 2009

February 24, 2009

Dear Ms Stevenson,

I am writing to encourage you to support the proposed cell tower on the property of St. Patrick's Episcopal Church in the Fruit Cove area of St. John's County. I travel often from the church south on State Road 13 to provide transportation to church members living in Switzerland and Orangedale and to deliver donated food and clothing to needy families in West St. Augustine. After I pass Roberts Road I find it impossible to get cell phone service for the next ten miles.

cell tower will not distract from the William Bartram Scenic and Historic Highway since SR 13 only becomes Scenic south of Roberts Road. Also, the tower will be located in a wooded area to the back of the church property and the base of the tower will certainly be landscaped.

I appreciate your attention to my concerns and all that you do to serve the people of St. John's County.

Sincerely,

Barbara Byers
3637 Loretto Road
Jacksonville, Fl 32223

*SJC Commission Office*

FEB 2 5 2009

20 February 2009

Cyndi Stevenson, Chair
Board of County Commissioners
500 Sebastian View
St Augustine, FL 32084

Re:    TOWER 2008-01, AT148/Fruit Cove
       Stealth Cell Tower

Dear Commissioner Stevenson:

I write to you about Anchor Tower's application to build a cell tower on the property of St Patrick's Episcopal Church on SR 13. I am favor of this application and respectfully ask for your support and the Board's approval.

I am a 20 year resident of Fruit Cove. My wife Linda and I live at 431 Cheryl Court, just off Fruit Cove Road. We know northwest St Johns County very well and have watched it grow and prosper, thanks in part to your leadership.

I know about this application as the senior warden at St Patrick's. I was the church's representative in Anchor Tower's negotiations to lease the church's property. This was no small decision on the church's part to go forward with the lease. I attended the Planning and Zoning Agency's hearing on 5 February to support the application.

First, I'm convinced as a consumer and involved citizen of the Fruit Cove and Julington Creek communities that there is a reasonable community need for this stealth cell tower for improved cell phone reception within homes and within cars in this area. Second, as senior warden at St Patrick's and as a local citizen, I'm convinced this structure will not pollute or otherwise impact views from any travel on SR 13 based on its location on our property, its planned landscaping, and the "inside the pole" antennae design. Our church membership discussed just these issues before deciding to proceed with Anchor Tower—the stealth tower will not detract from our worship or growth. And third, the church income derived from this venture will in part go to funding our outreach ministries in St Johns County.

I appreciate your time and consideration in this matter.

Sincerely,

*Hugh McClelland*

Hugh McClelland
431 Cheryl Court
St Johns, FL 32259

904-287-2432 (h)
904-608-0175 (c)

RECEIVED

MAR - 9 2009

ZONING DEPARTMENT
ST. JOHNS COUNTY

*SJC Commission Office*

FEB 2 5 2009

Dear Commissioner Stevenson,

As a member of St. Patrick's Episcopal Church, I would like to urge you to support the proposed cell tower being built on our property. It was approved by the Planning and Zoning Board and now the Historic Highway (State Road 13) Corridor management Council would like to prevent it being Built. This tower would not be an eye sore on the proposed scenic highway as it would be built on a Fully-developed residential and commercial/town center of the proposed area of the scenic highway. No historic oaks are on or immediately adjacent to the property and the bse of the tower will be fully landscaped.. Also, the tower will be in a wooded area and partially hidden by the natural tree line.

Cell phones have become an important part of our lives and can be a safety factor. It is important that we do not have problems with our cell phone reception. A tower in this location would facilitate continuous communication of 911,3G, 40, and GPS locator transmission. It would be helpful to my Service provider which is Verizon.. Since the tower is only a service provider it would not increase traffic on SR 13.

As another possible incentive, income from a lease may be taxable and will further our ability to care for the needy of St. Johns County.

Sincerely,

*Betty Boyd*

25 State Rd. 13, #21
St. Johns, FL

February 23, 2009

ROUTING TO:
DIST. 1 _____
DIST. 2 _____
DIST. 3 _____
DIST. 4 _____
DIST. 5 ✓
ALL ✓
_____
_____

c-

R E C E I V E D
MAR - 9 2009
ZONING DEPARTMENT
ST. JOHNS COUNTY

StJC Communication Officer

FEB 2 5 2009                    2 - 23 - 2009

DIST. 1
DIST. 2
DIST. 3
DIST. 4
DIST. 5
ALL  ✓

Ms Candi Stevenson,

As a resident of Julington Creek Plantation & a member of St. Patrick's, I have **NO** objection to the location of the proposed cell tower.

The tower is a service Oriented facility which will not increase traffic on SR 13 nor intensify use or density of the property.

Thank You,

Joel Sanders, P.E.

1181 Linwood Loop St Johns, Fl 32259

R E C E I V E D
MAR - 9 2009
ZONING DEPARTMENT
ST. JOHNS COUNTY



*SJC Commission Office*

Stay on the right track.....
John 14:6

FEB 2 5 2009

# Charlie and Katey Stuart

1256  Loch Tanna Loop
St. Johns, Fl 32259-5483

Email KCANTQ@MSN.COM

February 23, 2009

Ms. Cindi Stevenson
St. Johns County Board of
         County Commissioners
500 San Sebastian View
St. Augustine, Florida 32085

RECEIVED
MAR - 9 2009
ZONING DEPARTMENT
ST. JOHNS COUNTY

ROUTING TO:
DIST. 1 _____
DIST. 2 _____
DIST. 3 _____
DIST. 4 _____
DIST. 5 _____
ALL      ✓
_____
_____

RE: St. Patrick's Episcopal Church Tower 2008-1

Dear Cyndi,

I am writing to you to request your help in the approval and placement of a new cell
tower at St. Patrick's Episcopal Church as the Planning and Zoning Commission
approved for recommendation at their February 5, 2009 hearing. The church is located at
1221 SR 13 in St. Johns, midway between the entrance to Julington Creek Plantation and
Roberts Road. This area has many "dead"  cell phone zones where reception and signal
is limited at best and where dropped calls are experienced on a frequent basis.

I was present at the PZA hearing, and also spoke on behalf of having the system
approved. I was somewhat discouraged by Mr. Abbatiello's letter to the PZA stating that
this tower was unnecessary and that it would ruin the visual effect of the scenic highway
on this section of SR 13.

Mr. Abbatiello stated also that one of the reasons the tower was not necessary was that
the two towers on Worth Rd. south of the St. Patrick's site are only 1 ½ miles by air
away. His premise is therefore, that these towers should be able to provide adequate
coverage. The towers are actually close to 2 ½ miles as a straight line from the site. With
all the new uses for cell phones, IPods, Blackberries and internet phones, having towers
1 ½ miles apart, center to center, is necessary for reasonable reception.

As for State Route 13 being scenic between Racetrack Road and Roberts Road, there is
presently a mix of shopping centers, strip malls, gas stations, churches, homes, and a
sewage treatment plant. The description of the Bartram Scenic and Historical Highway
listed under the Florida Department of Transportation report truly only describes the area
between Roberts Road and State Route 16, which is winding and tree canopied.

The proposed tower at St. Patrick's, if approved by the commissioners, is not the same
obtrusive type of "buzzard's roost" structure that is on Racetrack Road at Mills Field near
SR 13. The proposed tower is a single poled stealth tower with a cross at the top as
shown on the enclosed picture.

The Zoning Department report stated that the site location substantially meets the

requirements of the Land Development Code, Section 6.08.12 with regards to setbacks, collapse zone distance requirements, and the Comprehensive Plan. The only variance requested was a reduction from six hundred (600) feet to three hundred fifty (350) feet distance from the center line of SR 13 to the tower site. Since the site already is in a wooded area, it's visibility from SR 13 should be very limited.

The placement of this tower is necessary to provide telecommunication services to an area that is presently a dead zone and is the only area suitable for that placement to provide updated service as needed.

For review of your final vote, please do not only consider normal cell phone usage in the area by residents and transients, but also to improve communication for 911 calls, weather emergencies, and other homeland security issues.

Thank you for your service and consideration on this subject.

Sincerely,

Charles M. Stuart

2

# UNIPOLE
## WITH CROSS



*SJC Commission Office*

FEB 2 6 2009

Dear Commisioners,

Please let the cell tower be built in our area of Fruit Cove. I have T-Mobile and some times have to go out side my house to get good reception. Others who come to my house who have sprint, verizon and other almost always have to go outside to use their cell phone. To put the tower at the location you are considering is ideal. It will not be unsightly or take away from the beauty of our historic scenic Bartram Trail Highway, SR13. I live on Moremen Rd. In the Switzerland area.

Sincerely,

Bernice Richartz

ROUTING TO:
DIST. 1 _____
DIST. 2 _____
DIST. 3 _____
DIST. 4 _____
DIST. 5 _____
ALL _____
_____
_____


RECEIVED
MAR - 9 2009
ZONING DEPARTMENT
ST. JOHNS COUNTY

Stay on the right track.....
John 14:6

MAR 0 4 2009

# Charlie and Katey Stuart

1256  Loch Tanna Loop
St. Johns, Fl 32259-5483

Email KCANTQ@MSN.COM

ROUTING TO:

DIST. 1 _____
DIST. 2 _____
DIST. 3 _____
DIST. 4 _____
DIST. 5 _____
ALL       X
_____
_____

March 3, 2009

Ms. Cindi Stevenson
St. Johns County Board of
         County Commissioners
500 San Sebastian View
St. Augustine, Florida 32085



R E C E I V E D
MAR - 9 2009
ZONING DEPARTMENT
ST. JOHNS COUNTY

RE: St. Patrick's Episcopal Church Tower 2008-1

Dear Cindi,

I am writing in support of the proposed cell tower on the St. Patrick's Episcopal Church
site at 1221 SR 13 in St. Johns (Tower 2008-01, AT 148/Fruit Cove Special Use Permit
Request). I live in Julington Creek Plantation, and was a member of the leadership team
and subsequent Vestry at St. Patrick's. We, along with our Diocesan representatives,
evaluated all the pros and cons of allowing a stealth cell tower on our church site. The
tower company worked intensively with us to meet all our concerns, especially
conservation of natural areas and blending into the grounds. The resulting design, I
believe, will fit in nicely with our natural wooded area and not be a detriment to any
views along our section of SR 13, also designated the William Bartram Scenic & Historic
Highway.

I did attend and speak at the PZA hearing. I became aware that several of the hearing
officers did not feel there was a real need for another cell tower in this area. Since I had
only personal experience to back up my statement about "dead zones", I decided to test
the service area. This test was not scientific and only included my phone which has
Verizon service. Most of the time I have to be near my dining room window before I can
get enough signal strength to make or receive a call without having it drop. You may be
interested in these "test" results when deliberating your decision:

- There is minimal to no reception whenever trees line the roadway.
- There is minimal service on Oakwood Branch, the entrance to Whispering Pines.
- Racetrack Rd. has great service heading west and east between the two towers
  already in place, except between Flora Branch Blvd. and Julington Creek
  Elementary School.
- Heading south on SR 13, service is lost just south of Cunningham Creek Estates
  and remains nearly non-existent until almost Greenridge off Roberts Rd.(I found
  it interesting that heading west on Roberts Rd. toward SR 13, there is no signal.
- Heading south on SR13 from Roberts Rd., there is no to minimal signal until
  Swiss Oaks and only weak signals until Switzerland Community Church near the
  Worth Rd. towers.

- Heading north on SR 13, the signal is fairly strong until Marywood where it becomes minimal to none.
- Signal strength increases again at Fruit Cove Rd. and is fairly strong heading north on Davis Pond to the circle at Durbin Creek Blvd.
- Signal strength again depletes to near nonexistent on Durbin Creek Blvd. from Edgewater to Whispering Pines, Oakwood Branch entrance.

Several of my friends with other carries have said their signals strengths are also lacking in most of these same areas.

I support the work that the William Bartram Scenic & Historic Management Council is doing to preserve the vistas along SR13. The membership of St. Patrick's Church desires to be a partner with them in beautifying this portion of SR 13 which is not very scenic. As we grow and can attend council meetings, we will do our best to enhance our property in conjunction with the design plans and to help this 4-lane highway and relatively commercial area become truly scenic.

I am planning to attend and may wish to speak at the hearing on March 17th concerning this request. I really feel this tower will bring needed service to our community as well as benefit St. Patrick's desire to expand their ministries to more areas of our county. If you have any questions, please feel free to call me or email me at kcantq@msn.com.

Thank you for your service and consideration on this subject.


Sincerely,

Katey Stuart
Katey Stuart

2

**Marie Hobbs**

| | |
|---|---|
| **From:** | CHARLES STUART [kcantq@msn.com] |
| **Sent:** | Tuesday, March 03, 2009 10:13 AM |
| **To:** | Commissioner Ron Sanchez; Commissioner Mark P. Miner; Commissioner Phillip Mays; Commissioner Ken Bryan |
| **Subject:** | Cell Tower |
| **Attachments:** | StPatsCellLtrBOCC209.docx |

Dear Ron, Mark, Phillip, and Ken,
On March 17th, you are scheduled to hear a special use permit request Tower 2008-01, concerning a cell tower to be erected on the grounds of St. Patrick's Episcopal Church at 1221 SR 13, in St. Johns. I had sent a letter in support of this cell tower to Cindi Stevenson by regular mail. I have attached a copy of that letter for your information.
If you have any questions, please feel free to contact me at kcantq@msn.com.
Thank you for your service to our community and the hard decisions you must make in these trying economic times.
Sincerely,
Charlie Stuart

3/5/2009

Stay on the right track.....

John 14:6

# Charlie and Katey Stuart

1256 Loch Tanna Loop
St. Johns, Fl 32259-5483

Email KCANTQ@MSN.COM

February 23, 2009

Ms. Cindi Stevenson
St. Johns County Board of
      County Commissioners
500 San Sebastian View
St. Augustine, Florida 32085

RE: St. Patrick's Episcopal Church Tower 2008-1

Dear Cyndi,

I am writing to you to request your help in the approval and placement of a new cell
tower at St. Patrick's Episcopal Church as the Planning and Zoning Commission
approved for recommendation at their February 5, 2009 hearing. The church is located at
1221 SR 13 in St. Johns, midway between the entrance to Julington Creek Plantation and
Roberts Road. This area has many "dead" cell phone zones where reception and signal is
limited at best and where dropped calls are experienced on a frequent basis.

I was present at the PZA hearing, and also spoke on behalf of having the system
approved. I was somewhat discouraged by Mr. Abbatiello's letter to the PZA stating that
this tower was unnecessary and that it would ruin the visual effect of the scenic highway
on this section of SR 13.

Mr. Abbatiello stated also that one of the reasons the tower was not necessary was that
the two towers on Worth Rd. south of the St. Patrick's site are only 1 ½ miles by air
away. His premise is therefore, that these towers should be able to provide adequate
coverage. The towers are actually close to 2 ½ miles as a straight line from the site. With
all the new uses for cell phones, IPods, Blackberries and internet phones, having towers
1 ½ miles apart, center to center, is necessary for reasonable reception.

As for State Route 13 being scenic between Racetrack Road and Roberts Road, there is
presently a mix of shopping centers, strip malls, gas stations, churches, homes, and a
sewage treatment plant. The description of the Bartram Scenic and Historical Highway
listed under the Florida Department of Transportation report truly only describes the area
between Roberts Road and State Route 16, which is winding and tree canopied.

The proposed tower at St. Patrick's, if approved by the commissioners, is not the same
obtrusive type of "buzzard's roost" structure that is on Racetrack Road at Mills Field near
SR 13. The proposed tower is a single poled stealth tower with a cross at the top as
shown on the enclosed picture.

The Zoning Department report stated that the site location substantially meets the

requirements of the Land Development Code, Section 6.08.12 with regards to setbacks, collapse zone distance requirements, and the Comprehensive Plan. The only variance requested was a reduction from six hundred (600) feet to three hundred fifty (350) feet distance from the center line of SR 13 to the tower site. Since the site already is in a wooded area, it's visibility from SR 13 should be very limited.

The placement of this tower is necessary to provide telecommunication services to an area that is presently a dead zone and is the only area suitable for that placement to provide updated service as needed.

For review of your final vote, please do not only consider normal cell phone usage in the area by residents and transients, but also to improve communication for 911 calls, weather emergencies, and other homeland security issues.

Thank you for your service and consideration on this subject.


Sincerely,


Charles M. Stuart

2

## Marie Hobbs

| | |
|---|---|
| **From:** | William Goreschak [Oarshack@bellsouth.net] |
| **Sent:** | Wednesday, March 04, 2009 10:20 PM |
| **To:** | Commissioner Ken Bryan |
| **Subject:** | Proposed Cell Phone Tower at St Patrick's Episcopal Church on SR 13 |

Dear Commissioner Bryan,

I live in River Oaks Plantation directly across the street from St Patrick's Church and I am also a Sprint cell phone customer. Accordingly, I have a definite interest in the proposed cell tower. My employer provided cell phone from Sprint will barely work in or near my own house. Because of the weak signal, most calls will go directly to voicemail or if they do ring through to me, they usually drop off about 10 seconds into the call. In fact, I have been waiting for a long time for improved service in our area and have complained to Sprint to improve their service.

Aesthetically, I think the cross design for the church site is very appropriate. I would have to drive by it at least twice per day and I have no objection to a tower, even if it were not one of the newer designs (cross, flag pole etc). Everything comes with a trade off. I would bet that some of the folks who drive around looking for things to complain about in our county regularly use their cell phones to make their complaint calls. Please do not succumb to the pressure of a small vocal group that generally opposes any growth or change. Improved cell phone service is desperately needed in this area for convenience and public safety. I remember driving down SR 13 towards the Green Cove Springs Bridge a number of years ago as a hurricane evacuation was in progress. Keeping in touch was impossible due to the lack of a cell phone signal as we sat in bumper to bumper traffic trying to make it to the other side of the river. Nowadays, my wife must drive to Keystone Heights regularly and better cell phone service is badly needed so she could contact the police or me should she have a car problem along the way. Quite honestly, the worst cell phone service between Fruit Cove and Keystone Heights is the stretch of SR 13 between Greenbrier and the Shands Bridge.

Additionally, in such a bad economy, having reliable cell phone service would allow more residents to drop their land line phones so they could save some money every month.

Please approve the proposed cell phone tower at the St Patrick's Church site.

Thank you for your time.

Bill Goreschak

Bill Goreschak
1293 Cunningham Creek Drive
Jacksonville, FL 32259
Phone: 904-230-1028    Fax: 904-230-1029    Mobile: 904-537-2607

**Marie Hobbs**

| | |
|---|---|
| **From:** | Diane Gorski |
| **Sent:** | Thursday, March 05, 2009 3:22 PM |
| **To:** | Marie Hobbs |
| **Subject:** | FW: Proposed Cell Phone Tower at St Patrick's Episcopal Church on SR 13 |

-----Original Message-----
From: Betty Dixon-Jihaad
Sent: Thursday, March 05, 2009 3:16 PM
To: Diane Gorski
Subject: FW: Proposed Cell Phone Tower at St Patrick's Episcopal Church on SR 13

Diane, this one was only addressed to Comm. Mays.  Betty

-----Original Message-----
From: William Goreschak [mailto:Oarshack@bellsouth.net]
Sent: Wednesday, March 04, 2009 10:19 PM
To: Commissioner Phillip Mays
Subject: Proposed Cell Phone Tower at St Patrick's Episcopal Church on SR 13

Dear Commissioner Mays,

I live in River Oaks Plantation directly across the street from St Patrick's Church and I am also a Sprint cell phone customer.  Accordingly, I have a definite interest in the proposed cell tower.  My employer provided cell phone from Sprint will barely work in or near my own house.  Because of the weak signal, most calls will go directly to voicemail or if they do ring through to me, they usually drop off about 10 seconds into the call.  In fact, I have been waiting for a long time for improved service in our area and have complained to Sprint to improve their service.

Aesthetically, I think the cross design for the church site is very appropriate.  I would have to drive by it at least twice per day and I have no objection to a tower, even if it were not one of the newer designs (cross, flag pole etc).  Everything comes with a trade off.  I would bet that some of the folks who drive around looking for things to complain about in our county regularly use their cell phones to make their complaint calls.  Please do not succumb to the pressure of a small vocal group that generally opposes any growth or change.  Improved cell phone service is desperately needed in this area for convenience and public safety.  I remember driving down SR 13 towards the Green Cove Springs Bridge a number of years ago as a hurricane evacuation was in progress. Keeping in touch was impossible due to the lack of a cell phone signal as we sat in bumper to bumper traffic trying to make it to the other side of the river.  Nowadays, my wife must drive to Keystone Heights regularly and better cell phone service is badly needed so she could contact the police or me should she have a car problem along the way.  Quite honestly, the worst cell phone service between Fruit Cove and Keystone Heights is the stretch of SR 13 between Greenbrier and the Shands Bridge.

Additionally, in such a bad economy, having reliable cell phone service would allow more residents to drop their land line phones so they could save some money every month.


Please approve the proposed cell phone tower at the St Patrick's Church site.


Thank you for your time.


Bill Goreschak



Bill Goreschak

1293 Cunningham Creek Drive

Jacksonville, FL 32259

Phone: 904-230-1028    Fax: 904-230-1029    Mobile: 904-537-2607