UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

ANCHOR TOWER, LLC, A FLORIDA
LIMITED LIABILITY COMPANY,

     Plaintiff,

v.                            Case No. 3:09-cv-00634-TJC-TEM

ST. JOHNS COUNTY, FLORIDA, A
POLITICAL SUBDIVISION OF THE
STATE OF FLORIDA,

     Defendant.

_____/

## MOTION FOR SUMMARY JUDGMENT

Plaintiff, ANCHOR TOWER, LLC ("Anchor"), by and through its undersigned counsel, pursuant to Fed. R. Civ. P. 56, files its Motion for Summary Judgment with Incorporated Memorandum of Law.

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

### BACKGROUND

This is an action for declaratory and injunctive relief. Anchor filed its two-count Complaint on May 8, 2009. The Complaint alleges that St. Johns County ("the County") violated the Federal Telecommunications Act of 1996, 47 U.S.C. § 332, et seq. when it denied Anchor's application to place a 150' mono-cross telecommunications tower within 600 feet of a designated scenic roadway. Count I of Anchor's Complaint seeks a declaration that the County violated the Federal Telecommunications Act of 1996, § 332(c)(7)(B)(iii), by failing to base its decision on competent, substantial evidence. Count II seeks a mandatory injunction, pursuant to 47 U.S.C. § 332, requiring the County

to approve Anchor's 150' mono-cross telecommunications tower application. The Complaint also alleges that the County violated Florida state law. Count III of the Complaint seeks a declaration under Chapter 86, Florida Statutes, that in the processing of Anchor's application, the County violated the approval time frames set forth in Section 365.172(12)(d)(2) and (3) and that the application is automatically approved. This motion for summary judgment follows.

## STANDARD OF REVIEW

Summary judgment is warranted, as here, when the evidence reveals that no genuine dispute exists regarding any material fact and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The Telecommunications Act of 1996, 47 U.S.C. § 332(c)(7)(B)(iii), requires that a denial of a request to construct a wireless facility be in writing and supported by substantial evidence from a written record. As is set forth below the decision to deny the application made by the County is not supported by competent substantial evidence and the County failed to act on the application within the time frames provided under Florida Law, resulting in automatic approval. The record below demonstrates that there are no general issues of material fact and Anchor is entitled to summary judgment as a matter of law.

## UNDISPUTED FACTS

Anchor is in the business of providing service to various licensed personal wireless telecommunications providers by locating, leasing, zoning, constructing, and owning personal wireless service facilities. Anchor proposed to build a 150' mono-cross telecommunications tower (the "Proposed Mono-Cross Tower") on a parcel of land

2

leased from the Episcopal Church in the Diocese of Florida, Inc. (the "Leased Parcel"). [2] R-1, p. 4-5, 23-31.   The Diocese operates St. Patrick's Episcopal Church on the parent tract of the Leased Parcel (the "Church property"). R-7, p. 598-9.  The parent tract is located at 1221 SR 13 North, St. Johns County, Florida. R-1, p. 4. Anchor's proposed tenants for the tower included MetroPCS and T-Mobile.  R-1, p. 7-8.  MetroPCS and T-Mobile are in the business of providing cellular telecommunications services.  MetroPCS, as the anchor tenant, requested the construction of a tower on which to locate its personal wireless service facilities to close a service coverage gap of its cellular telecommunications services to the commercial properties and residential neighborhoods surrounding the Leased Parcel.  R-1, p. 7, R-7, p. 568.  In addition to these basic service coverage needs, the tower would also provide E911 location services to the surrounding area.  R-1, p. 7.  T-Mobile expressed interest in collocating on the Proposed Mono-Cross Tower once zoning approval was obtained.  R-1, p. 8, R-7, p. 568.

The Church property is zoned RS-E (Residential-Single Family) and has a Future Land Use designation of Residential-B.  R-1, p.1, R-4, p. 194.  Under the St. Johns County Land Development Code §§ 2.03.01 and 2.03.26, telecommunications towers are allowed as a special use in residential zoning categories.  Section 2.03.6 provides as follows:

> **Section 2.03.26  Antenna Towers**
>
> Antenna Towers may be permitted as a Special Use within districts as defined in Section 2.03.01. Such Antenna Towers shall be

---

[2] Counts I and II of Anchor's Complaint are to be resolved based on the Court's review of the record developed below.  The Record of the proceedings below has been indexed and jointly filed with the Court as a separate document. Citations to the Record shall be as follows:  R-___, p. ___.

subject to the requirements of Part 3.04.00 and Section 6.08.12 of this Code and further subject to the following:

A.　Notwithstanding anything to the contrary in this Code, no Antenna Tower other than an unguyed monopole tower or Alternative Tower Structure shall be located in any residential zoning district.

B.　Regardless of the zoning district in which the Antenna Tower is located, any tower proposed to be within two hundred fifty (250) feet of the nearest Lot line of any residential or Open Rural (or) zoning district shall be reviewed as a Special Use.

C.　And the applicant shall demonstrate that there are no other suitable existing Antenna Towers or structures on which the applicant/provider can reasonable [sic] place its antennas, as provided in Section 6.08.12.R.

D.　There are no significant adverse impacts to Environmentally Sensitive Areas or areas judged to possess unique environmental or cultural qualities.

E.　This Section 2.03.26 does not apply to antenna towers and air traffic control towers associated with aviation Use constructed on property zoned Airport Development District or to Antenna Towers and Antennas built for St. Johns County government use.

Sec. 2.03.26, St. Johns County Land Development Code.[3] Section 6.08.12 of the St. Johns County Land Development Code (hereinafter "St. Johns LDC") further provides certain performance standards, and locational and design criteria for telecommunications towers and antennae as follows:

A.　towers located in or near residential zoning districts must be located at least 250' from the nearest lot line of any residential zoning district; and

B.　towers located in residential zoning districts have a maximum height of 150' if constructed for two or more users; and

C.　the distance of any tower from the closest residential dwelling, school, or emergency evacuation shelter shall be equal to or greater to the designed Collapse Zone; and

---

[3] Part 3.04.00 of the Land Development Code addresses the Airport Overlay District, which was not implicated by the location of the Proposed Mono-Cross Tower.

D.   no tower shall be built or corrected within 600' of the center line of any designated scenic highway without the final approval of the Board of County Commissioners.

Section 6.08.12, St. Johns County LDC.   Section 32 of the County's Development Review Manual provides comprehensive details regarding the antenna tower approval process.   Section 32.05 provides that tower applications requiring a Special Use Permit are to be heard by the St. Johns County Planning and Zoning Agency (hereinafter "PZA") and that action by the PZA results in final action by the County on the tower application unless certain waivers are requested.   Specifically, § 32.05(D) provides as follows:

> A Final Order of the Planning and Zoning Agency will be prepared and signed by the chairperson of the agency within 30 days of the hearing at which the request was made and action was taken.   The Final Order will be mailed to the applicant, or representative. (Note: Certain Waivers to section 6.08.12 require action by the Board of County Commissioners.   Those actions will be noticed and processed in the same manner as above stated for the original hearing and will occur after action by the Planning and Zoning Agency on the Special Use Application.).

Section 32.05(D), St. Johns County Development Review Manual.   Section 6.08.12 of the St. Johns LDC provides for waivers for three different performance criteria:  landscaping, collocation requirements, and location with the 600' setback of a scenic highway. Anchor's application met all of the landscaping and collocation requirements set forth in §6.08.12 and sought relief only from the 600' scenic highway setback requirement, specifically set forth as follows:

V.   Antenna Towers located on Scenic Highways

No Antenna Tower shall be built or erected within six hundred (600) feet of the centerline of any designated Scenic Highway or Scenic Roadway without the final approval of the Board of County Commissioners, after

consideration and recommendation by the Planning and Zoning Agency.

The Board of County Commissioners shall not issue an approval for the location of an Antenna Tower within six hundred (600) feet of any designated Scenic Highway or Scenic Roadway as defined in Article XII of this Code unless the applicant establishes that disapproval of such tower would prohibit communications service to a particular area. The use of an Alternative Tower Structure shall be considered in the approval of an Antenna Tower within six hundred (600) feet of a designated Scenic Highway or Scenic Roadway.

Section 6.08.12(V), St. Johns LDC (emphasis added).    The St. Johns LDC contains no other criteria on which the Board is to base its decision on requests for tower placement within the 600' scenic roadway setback.

The Church Property is a nearly rectangular, ± 5 acre tract of land located on the east side of SR 13. R-1, p. 35-6, 44. It is ± 600 feet deep. R-1, p. 35-6, 44.  The Proposed Mono-Cross Tower's location on the Church Property was 250' from the eastern property line so as to meet the 250' setback from residentially zoned property. R-1, p.4, 35-6, 44. This placed the tower 350' from the right-of-way of SR 13, a Designated Scenic Highway.[4] R-1, p. 4, 35-6, 44. Because the Proposed Mono-Cross Tower was located within 600' of a Designated Scenic Roadway all of the necessary approvals required for the tower were bifurcated. R-1, p. 46. The PZA was charged with final review and consideration of all aspects of the Proposed Mono-Cross Tower except its location within the 600' Scenic Highway setback, on which it was advisory. R-1, p. 46, R-3, p. 94-5. The Board of County Commissioners was charged with final approval only of the Proposed

---

[4] SR 13 is often referred to in the record as the William Bartram Scenic Highway.

Mono-Cross Tower's location within the 600' Scenic Highway setback, after consideration and review by the PZA. R-1, p. 46, R-3, p. 94-5.

Anchor Tower submitted its application for Special Use approval on June 24, 2008. R-1, p. 1. The application was heard by the PZA at its February 5, 2009 meeting. The PZA approved the Proposed Mono-Cross Tower on a 4-3 vote and the PZA also recommended approval to the Board of County Commissioners of its location within the 600' Scenic Highway setback. R- 4, p. 192. In approving the Proposed Mono-Cross Tower the PZA made the following findings of fact:

> 1. The request is consistent with Section 2.02.1 allowing communication antenna towers in an RS-E zoning district and 2.03.26; conditions for approval of special use permit pursuant to Section 6.08.12 except as waived herein;
>
> 2. The request is not in conflict with the Comprehensive Plan;
>
> 3. The construction of a 150-foot alternative tower structure with accessory equipment building(s) and antenna in this location is compatible with the surrounding area;
>
> 4. The location and placement of communication antenna tower providing compliance with Section 6.08.12 and conditions as herein provided promotes the health, safety and general welfare of the citizens of the area;
>
> 5. The antenna tower is necessary to provide telecommunication service to a particular area and there are no suitable existing antenna towers;
>
> 6. There are no significant adverse impacts to environmentally sensitive areas or areas judged to possess unique environmental or cultural properties, and
>
> 7. At the public hearing the applicant has stated no objections to the conditions.

R-4, p. 192. The County scheduled the scenic highway setback issue for the March 17, 2009 Board of County Commissioners meeting. In preparation for the Board of County Commissioners' meeting, the planning staff of St. Johns County prepared a Staff Report. R-4, p. 192-343. In the Staff Report, the Staff advised the Board that the PZA had approved the tower and that the only issue before the board was approval within the 600' scenic highway setback. R-4, p. 192. In the report Staff advised the Board that they had no objection to the tower's location within the 600' Scenic Highway setback. R-4, p. 192-6.

At the hearing, St. Johns County Staff presented the application. R-7, p. 558-60. The Staff correctly introduced the matter before the Board as a request to allow a 150' Mono-cross alternative tower structure and associated equipment buildings to be located 350 feet from the center line of a scenic highway. R-7, p. 558-60. Staff informed the Board that the PZA approved the tower and recommended approval of the waiver to the Board of County Commissioners with a vote of four to three. R-7, p. 558-60. Staff advised the Board that the request substantially met the requirements of the land development code and was consistent with the comprehensive plan. R-7, p. 558-60. The Staff gave no other presentation and offered no other evidence at the hearing. R-7, p. 556-691.

At the BOCC hearing, Anchor presented the testimony of Clarence Johnson, a Radio Frequency ("RF") engineer for MetroPCS, the anchor tenant on the Proposed Mono-Cross Tower. R-7, p. 581. Mr. Johnson has an associate degree in Electrical Engineering and a bachelor's degree in Technical Project Management from ITT Technology. R-7, p. 639-40. Mr. Johnson has 14 years of military experience in

8

communications and aviation electronics and over 16 years of civilian RF engineering experience in the telecommunications industry. R-7, p. 639-40. Mr. Johnson is currently employed as part of the MetroPCS project design team. R-7, p. 639-40. Mr. Johnson testified before the Board that the MetroPCS coverage objective was to provide indoor coverage to the area surrounding the Proposed Mono-Cross Tower location. R-7, p. 581-3, 655-7. As part of the presentation "before" and "after" coverage maps for MetroPCS were placed in the record. R-7, p. 568, R-6, p. 522, 547. The "before" map demonstrated the lack of existing coverage that MetroPCS has without the Proposed Mono-Cross Tower location. R-7, p. 655-7. When questioned about the ability to use existing towers to close MetroPCS' coverage gap, Anchor submitted a map of all existing towers in the area. R-78, p. 640, R-6, p. 521. Mr. Johnson testified that MetroPCS currently has antennae collocated on towers along SR13 both to the north and south of the Proposed Mono-Cross Tower location. R-7, p. 640-1, R-6, p. 527. These current antennae locations are denoted on the both the "before" and "after" maps as "Jax120A" and "Jax019A." R-6, p. 522, 547. The before map demonstrates that MetroPCS is able to provide indoor coverage around these two locations but suffers a sizeable gap in coverage in the area surrounding the Proposed Mono-Cross Tower location, denoted on the maps as "Jax123D." R-6, p. 522, R-7, p. 655-7. The "before" map demonstrates that the existing coverage in this area is minimal, limited to outdoor and in-vehicle. R-6, p. 522, R-7, p. 582-84, R-7, p. 655-7. The "after" map demonstrates that with the Proposed Mono-Cross Tower location MetroPCS will be able to provide indoor coverage to a 2 to 2 1/2 mile radius of the site and that further to the east, some areas with no existing

9

coverage pick up outdoor coverage while other areas with only outdoor coverage pick up in-vehicle coverage. R-6, p. 547, R-7, p. 655-7.

Ten citizens spoke during the public hearing: three in favor and seven opposed. R-7, p. 593-637. Those in opposition did not offer any testimony related to the MetroPCS coverage issue.[5] Clara Cowan objected to the height of 150' and asked for a moratorium on towers. R-7, p. 573-4. Mary Cornwell testified that the area is beautiful and stated her general objection to the tower. R-7, p. 621-4. Phyllis Abbatiello testified as to how her cell phone saved her life and that she had coverage in her home but she did not identify who her carrier was. R-7, p. 616-20. She also objected to St. Patrick's receiving any revenue for leasing their property to Anchor. R-7, p. 619. Ellen Whitmer objected to the tower based on her position that the Proposed Mono-Cross Tower violated the St. Johns County Comprehensive Plan which prohibits commercial development within 600 feet of a scenic highway. R-7, p. 629-32. She also expressed her view that MetroPCS had not met its burden of proof because it had not presented any statistics about how many customers it has. R-7, p. 629-32. Robert Fitzgerald testified that he has a master's degree in electrical engineering but offered no fact-based testimony to rebut the coverage evidence provided by Clarence Johnson. R-7, p. 633-6. Diane Mills stated her general disagreement with "what's happening here today." R-7, p. 636-7. She also stated that every member of her family has a cell phone and "we're not having any more problems than anybody else in the County." R-7, p. 636-7. She did not identify her cell phone carrier. R-7, p. 636-7. Mr. Abbatiello lives across SR13 from the Church Property.

---

[5] None of the written comments submitted to the County make any mention of MetroPCS' coverage in the area either. R-5, p. 344-467.

10

R-7, p. 601. He classified himself as an expert in wireless communications, but cross-examination by the County Chairwoman revealed that he is not an engineer, has no formal education or training and retired from a sales position at Motorola 12 years ago. R-7, p. 602-3, 611-12. Mr. Abbatiello argued that MetroPCS had not met its burden of establishing a prohibition on coverage as required under the LDC because a MetroPCS phone user could simply move to an area where coverage was provided in order to use their phone. R-7, p. 603-4.

After Anchor had made its presentation to the Board and the citizen testimony was complete, the Board moved in to deliberations. R-7, p. 645-73. The discussion amongst the Board members centered around whether the applicant had demonstrated a "need" for the location. R-7, p. 645-50. At that point the County Attorney advised the Board as follows:

> Madame Chair, and members of the board, I hate to be the-
> -sort of bad guy here—or the heavy. What I would tell you is
> that if the County—or if opponents to the application had hired
> an expert that could have put competent substantial evidence
> into the record pertaining to the coverage, the County would be
> in a viable position to defend on this that issue. Coverage only
> becomes an issue if it goes to the height of the tower, whether
> that height is required for the requested coverage or not. I have
> not seen anything in the record adverse or against the evidence
> that the applicant put in. And I do appreciate—without in any
> way professionally speaking negatively of the application or
> the applicant is—obviously, it would be helpful and I would
> say respectful if they had had their project expert here today to
> speak on the matter. Nonetheless, the evidence that is in the
> record, in my view, is competent and it is on only one side of
> the scale on that issue.      And that is the applicant's
> demonstration of a lack of coverage. Theoretically, there could
> have been something on the scale on the other side, but I will
> tell you, in my view, I don't think its there. And I would have
> to urge caution.

R-7, p. 650-1.

> Commissioner Miner made the motion to deny as follows:

>> Based on the Findings of Fact 1, 2, and 3, I'd like to….make a
>> motion to deny tower 2008-01…..

R-7, p. 668.

The motion was seconded and then County Attorney McCormack interjected to

he Board that "housekeeping type elements" needed to be included in the Motion and

asked the Board for a 10 minute recess. R-7, p. 668-9.  When the meeting resumed

Attorney McCormack asked Commissioner Miner to consider adding additional findings

to his motion which he did. R-7, p. 670-1.  The County's Order Denying Tower 2008-01

AT148/Fruit Cove sets forth the following Findings of Fact:

### FINDINGS OF FACT

1.   The request is contrary to the public interest and is in conflict with the surrounding development;[2]

2.   The request does not meet the criteria set forth in the LDC, specifically including, but not limited to, Sections 2.03.26 and 6:08.12.V;

3.   The request is in conflict with the Future Land Use Designation of Residential-B;

4.   The proposed structure is not consistent with the St. Johns County Comprehensive Plan, particularly the Northwest Sector and Scenic Corridor portions;

5.   The coverage maps presented by the Applicant do not provide evidence that denial of the application will prohibit communications in the subject area, in fact, the "before" coverage map shows at least three levels of communications coverage in the area;

6.   The evidence presented by the Applicant, particularly the "before" and "after" coverage maps fail to clearly show that the proposed tower will provide a substantial improvement in coverage in the subject area as described by the Applicant and therefore fails to demonstrate a need for the proposed tower;

12

7.    The Applicant failed to demonstrate that there was no other suitable location to place a telecommunication tower to serve the subject area, including a location that would not negatively impact the Scenic Highway Corridor – the evidence presented was speculative in nature; and

8.    The Applicant failed to demonstrate that the requested height of 150 feet is required to ensure that there would not be an effective prohibition of communication service in the subject area and that a lower tower would not suffice to add any desired coverage.1

2  *See* sections 6.08, 12P, and 6.08, 12V of the Land Development Code
1  *See* Section 6.08, 12V of the Land Development Code; *See also* section 365.172(11)(b)1, F.S.

R-9, p. 693-5.

This appeal follows.


## COUNTS I AND II

## THE ST. JOHNS COUNTY'S DENIAL OF ANCHOR TOWER'S APPLICATION IS VIOLATIVE OF THE FEDERAL TELECOMMUNICATIONS ACT OF 1996, 47 U.S.C. § 332

The United States Congress enacted the Federal Telecommunications Act of 1996 (the "Act") to create a national policy framework to accelerate the deployment of telecommunications technology. Nextel Communications of Mid-Atlantic, Inc. v. City of Cambridge, 246 F. Supp. 2d 118, 122-23, (D. Mass. 2003); see also H.R. Cong. Rep. No. 104-458, 104th Cong. 2D Sess. 1 (1996). The Act does so in part by placing certain substantive and procedural limitations upon the authority of local bodies to regulate and limit the construction of facilities for wireless communication services.  Any person adversely affected by any final action or failure to act by a State or local government or any instrumentality thereof, may, within 30 days after such action or failure to act,

commence an action in any court of competent jurisdiction. The court shall hear and decide such action on an expedited basis. See 47 U.S.C. § 332(c)(7)(B)(v).

One of those limitations, found in 47 U.S.C. §332(c)(7)(B)(iii), requires that "any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record." Case law applying 47 U.S.C. §332(c)(7)(B)(iii) requires that local governments, when denying requests to place or construct wireless service facilities, produce a "writing" separate from the written record, describe the reasons for the denial, and contain a sufficient explanation for the reasons for the denial. New Par v. City of Saginaw, 301 F. 3d 390, 395-95 (6th Cir. 2002); USOC of Greater Iowa, Inc. v. City of Bellevue, Nebraska, 279 F. Supp. 2d. 1080, 1084-85 (D. Neb. 2003); see also AT&T Wireless Services of Florida v. Orange County, 982 F. Supp. 856, 859 (M.D. Fla. 1997); Western PCS II Corp. v. Extraterritorial Zoning Authority of the City and County of Santa Fe, 957 F. Supp. 1230, 1237 (D.N.M. 1997); Illinois RSA No. 3, Inc. v. County of Peoria, 963 F. Supp. 732, 743-44 (C.D. Ill. 1997); Virginia Metronet, Inc. v. Board of Supervisors of James City County, 984 F. Supp. 966, 972 (E.D. Va. 1998). Congress established this procedural requirement to ensure the creation of a proper record to allow a reviewing court to weigh the specific rationale for the denial and determine if that rationale comports with the Act's provisions. New Par, 301 F. 2d at 395-96; OPM-USA, Inc. v. County of Marion, Florida, 1999 U.S. Dist. Lexis 19348 (M.D. Fla. 1999); AT&T Wireless PCS, Inc., 979 F. Supp. At 427; Western PCS, 957 F. Supp. at 1236. This procedural requirement serves a substantive purpose which is to allow the reviewing court to determine if the local government's

decision is based on competent, substantial evidence, also required under 47 U.S.C. §332(c)(7)(B)(iii).

47 U.S.C. §332(c)(7)(A), which provides as follows:

> (7) Preservation of local zoning authority
>
> > (A) General Authority
> >
> > > Except as provided in this paragraph, nothing in this Chapter shall limit or affect the authority of a state or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities.

47 U.S.C. §332(c)(7)(A). Consequently, the Act requires a determination whether the zoning decision at issue is supported by substantial evidence in the context of applicable state and local law. This Court must take the applicable local and state regulations as we find them and evaluate the County's decision based on the evidentiary support (or lack thereof) related to those regulations. See Metro PCS, Inc. v. The City and County of San Francisco, 400 F. 3d 715, 723-34 (9th Cir. 2005).

Although the statute does not expressly define "substantial evidence" the legislative history makes clear that the phrase "substantial evidence contained in a written record" is meant to be the "traditional standard used for judicial review of agency actions." H.R. Conf. No. 104-458, 104th Congress, 2d Sess. 2008 (1996); see also Preferred Sites, LLC v. Troup County, 296 F.3d 1210, 1218 (11th Cir. 2002). The 11th Circuit defined "substantial evidence" as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Preferred Sites, 296 F.3d at 1218. A review of the record below establishes that the

County's decision is not supported by competent, substantial evidence in the record and Anchor Tower is entitled to summary judgment as a matter of law.

As discussed below, the Findings of Fact set forth in the Board's Order are all either: "findings" on issues which the PZA has already taken contrary and final action; not limited to the narrow issue before the Board; or are inaccurate characterizations of the testimony on the record. Each of the findings will be discussed below in numeral order.

### Finding No. 1

Not only is this finding is so vague as to be fatal without even a review of the record below it is not relevant to the narrow issue before the Board and contradicts final action taken by the PZA.   The only issue before the Board is whether Anchor demonstrated that "disapproval would prohibit communications service to a particular area." The PZA had already found that the request was compatible with the surrounding development and that is promoted the health, safety, and general welfare of the citizens of the area.  R-4, p. 192. None of the members of the public nor any Commissioner discussed opposition to the tower based on its incompatibility with surrounding development. The focus of all discussion was whether the Proposed Mono-Cross Tower should be placed in the Scenic Highway setback and the sole criterion for making that decision.   The matter  before the Board is a quasi-judicial land use proceeding and the Applicant is owed something better than a bare finding that the Proposed Mono-Cross Tower is contrary to the public interest and in conflict with surrounding development.

### Finding No. 2

This finding of fact also exceeds the scope of the Board's review and invades the province of the PZA, which has already made a final determination of all the criteria in the LDC except Section 6.08.12.V.  As discussed above, the only relevant criterion is whether the denial of the application would prohibit communications service to a particular area.  This finding of fact, standing alone, is insufficient to support a denial.

### Finding No. 3

This finding is fatal for several reasons.  First the PZA has passed on this issue. Second, it goes beyond the scope of the Board's review, and finally there is absolutely no evidence in the record  to support or explain this conclusory finding.

### Finding No. 4

The record below does not support this Finding.  The County's professional staff determined that the application was consistent with the County's Comprehensive Plan. The PZA made that finding as well.  Citizen objector Ellen Whitmer asserted that Objective A.1.3.8 of the comprehensive plan prohibited commercial development within 600' of SR13 but County Attorney McCormack advised the Board that the County's professional staff  had determined that Proposed Mono-Cross Tower is not considered a commercial use under the LDC and that he had reviewed this issue and believed the staff's interpretation to be the correct one. R-7, 632-3.  There was no discussion amongst the Board about consistency with the comprehensive plan until they were discussing the findings of fact that they wanted to put in the order and Chairwoman Stevenson asked the County Attorney whether they needed to add such a finding. R-7, p. 672.  His response to her was that they could make such a finding and without any further discussion directed

17

the County Attorney to include such a finding in the final order. R-7, p. 672. No specific sections of the comprehensive plan were discussed or referred to in the order and just how this request is inconsistent with the comprehensive plan remains a mystery.

**Finding No. 5**

This finding is not supported by competent substantial evidence in the record. The only evidence in the record as to the issue of MetroPCS coverage is that presented by MetroPCS. The "before" map demonstrates an almost complete lack of indoor coverage in the area of the Proposed Mono-Cross Tower. This evidence was uncontroverted. The "after" map clearly demonstrates the proposed Mono-Cross location provides indoor coverage to the area, meeting the expressed coverage objective. This evidence was also uncontroverted. The Board's personal conclusion that the coverage maps do not provide evidence that denial would prohibit communications service in the area does not constitute substantial evidence. T-Mobile South, LLC v. Coweta County Georgia, 2009 WL 596012 (N.D. Ga. 2009). The Coweta County case is instructive. One of the issues before the Northern District of Georgia court was whether there was substantial evidence in the record to support T-Mobile's need for its proposed tower. Similar to the case at hand, the only evidence before the County was T-Mobile's "before" and "after" coverage maps and a neighbor's testimony that he gets T-Mobile coverage in his home. Id. at p. 7. The Coweta court ruled that the coverage maps qualified as technical evidence of the need for the tower and that the board's own personal conclusion that the maps did not show a substantial improvement in coverage was not substantial evidence. Id. As in the Coweta case, the only competent substantial evidence before the Board were the MetroPCS maps and the Board is not free to ignore it.

**Finding No. 6**

This finding of fact is inconsistent with the sole criteria on which the Board was supposed to evaluate the application. The decisions of the Board must be based on the requirements set forth in the St. Johns LDC. T-Mobile South, LLC, at p. 7 (citing Cellular Telephone Co. v. Tower of Oyster Bay, 166 F. 3d 490, 494 (2d Cir. 1999). On the narrow issue before the Board, under the St. Johns LDC, Anchor's burden is to establish "that disapproval of such tower could prohibit communications service to a particular area." §6.08.12(v), St. Johns LDC. There is no further specificity in the LDC. MetroPCS testified that indoor coverage was the objective, indoor coverage was not currently being provided to the particular area, and that denial would prohibit MetroPCS from providing indoor coverage. None of this evidence was controverted and based on the Coweta County case this board was not free to discard the only competent substantial evidence before it.

**Finding No. 7**

This finding goes beyond the narrow issue before the board, and has already been passed on by the Planning and Zoning Agency. Section 2.03.26(D), set forth above, which are the part of the criteria the Planning and Zoning Agency must use when passing on tower applications, requires that the applicant demonstrate that there are no other suitable existing Antenna Towers or structures it could use, as provided in Section 6.08.12(R). This was a suggested finding in the Staff Report prepared for the Planning

and Zoning Agency. R-3, p. 96. The Planning and Zoning Agency's approval of the Proposed Mono-Cross Tower renders this issue already decided by St. Johns County. [6]

Even if this were a relevant issue before the Board, there is uncontroverted competent, substantial evidence in the record to support Anchor's position. Clarence Johnson testified that MetroPCS is already collocated on the two existing towers closest to the Proposed Mono-Cross Tower and they are insufficient to meet the coverage objective in the area. R-7, p. 640-1. There were no buildings available that were 145' high on which to place the Antenna. R-7, p. 640. Anchor's application asserted that there were no other suitable properties in the area large enough to accommodate the structure R-1, p. 4. A review of the zoning map confirms demonstrates that nearly all the parcels near the Church Property and outside of the 600' setback are small single family home lots, insufficient in size to meet residential setback requirements. R-3, p. 182.

## Finding No. 8

This finding also goes beyond the narrow issue before the board which was the location of the tower within the scenic highway setback. The height of the Proposed Mono-Cross had already been passed upon by the PZA. As such this finding is unsustainable.

---

[6] Section 6.08.12(R) further provides that event a dispute arises as to whether an Applicant has met its requirement to demonstrate that there are no other suitable Antenna Towers or structures on which to place its facilities, the County may require a third party technical study at the expense of the Applicant. This issue went unchallenged by the County until the Final Order was drafted. The County simply cannot be heard to complain now on this issue.

Not only is Anchor Tower entitled to summary judgment on Count I as a matter of law for the County's failure to abide by 47 USC § 332 et seq., Anchor Tower is also entitled to mandamus and/or injunctive relief, directing the County to approve the application at issue, as requested in Count II of its Complaint. New Par, 301 F. 3d at 399-401; USOC of Greater Iowa, 279 F. Supp. at 1088-89; SBA Communications, Inc. v. Zoning Commission of the Town of Franklin, 164 F. Supp. 2d 280, 294 (D. Conn. 201); Illinois RSA, 963 F. Supp. at 747; and Western PCS, 957 F. Supp. at 1237.

## COUNT III

Count III of Anchor's Complaint seeks declaratory relief pursuant to Chapter 86 Fla. Statutes.  Specifically, Anchor seeks to have determined the status of its application pursuant to Fla. Stat. §365.172(12)(d)(2) and (3).  Anchor submits to this Court that no genuine issue of material fact exists as to whether 90 business days elapsed prior to the March 17, 2009 Board of County Commissioners meeting and Anchor's application is approved as a matter of law.

Fla. Stat. §86.021 provides as follows:

> **Power to construe**. – Any person claiming to be interested
> or who may be in doubt about his or her rights under a deed,
> will, contract, or other article, memorandum, or instrument in
> writing or whose rights, status, or other equitable or legal
> relations are affected by a statute, or any regulation made
> under statutory authority, or by municipal ordinance,
> contract, deed, will, franchise or other article, memorandum,
> or instrument in writing may have determined any question
> of construction or validity arising under such statute,
> regulation, municipal ordinance, contract, deed, will,
> franchise, or other article, memorandum, or instrument in
> writing, or any part thereof, and obtain a declaration of
> rights, status, or other equitable or legal relations thereunder.

21

Fla. Stat. §86.021 (2009). Anchor contends that its rights, particularly the approval of its application, are affected by Fla. Stat. §365.172(12)(d)(2) and (3) which provides as follows:

> 2. A local government shall grant or deny each properly completed application for any other wireless communications facility based on the application's compliance with the local government's applicable regulations, including but not limited to land development regulations, consistent with this subsection and within the normal timeframe for a similar type review but in no case later than 90 business days after the date the application is determined to be properly completed in accordance with this paragraph.

> 3.a. An application is deemed submitted or resubmitted on the date the application is received by the local government. If the local government does not notify the applicant in writing that the application is not completed in compliance with the local government's regulations within 20 business days after the date the application is initially submitted or additional information resubmitted, the application is deemed, for administrative purposes only, to be properly completed and properly submitted. However, the determination shall not be deemed as an approval of the application. If the application is not completed in compliance with the local government's regulations, the local government shall so notify the applicant in writing and the notification must indicate with specificity any deficiencies in the required documents or deficiencies in the content of the required documents which, if cured, make application properly completed. Upon resubmission of information to cure the stated deficiencies, the local government shall notify the applicant, in writing, within the normal timeframes of review, but in no case longer than 20 business days after the additional information is submitted, of any remaining deficiencies that must be cured. Deficiencies in document type or content not specified by the local government do not make the application incomplete. Notwithstanding this subparagraph, if a specified deficiency is not properly cured when the applicant resubmits its application to comply with the notice of deficiencies, the local government may continue to request the information until such time as the specified deficiency is cured. The local government may establish

reasonable timeframes within which the required information to cure the application deficiencies is to be provided or the application will be considered withdrawn or closed.

b.     If the local government fails to grant or deny a properly completed application for a wireless communications facility within the timeframes set forth in this paragraph, the application shall be deemed automatically approved and the applicant may proceed with placement of the facilities without interference or penalty. The timeframes specified in subparagraph 2 may be extended only to the extent that the application has not been granted or denied because the local government's procedures generally applicable to all other similar types of applications require action by the governing body and such action has not taken place within the timeframes specified in subparagraph 2. Under such circumstances, the local government must act to either grant or deny the application at its next regularly scheduled meeting or, otherwise, the application is deemed to be automatically approved.

c.     To be effective, a waiver of the timeframes set forth in this paragraph must be voluntarily agreed to by the applicant and the local government. A local government may request, but not require, a waiver of the timeframes by the applicant, except that, with respect to a specific application, a one time waiver maybe required in the case of a declared local, state, or federal emergency that affects the administration of all permitting activities of the local government.

Fla. Stat. § 365.172(12)(d)(2) and (3) (emphasis added).  This statute essentially provides that a local government must act on wireless facility application within 90 business days after the application is determined to be properly completed.  Anchor contends that its application was properly completed on October 6, 2008 and that St. Johns County had 90 business days from that date on which to act on the application.  Anchor further asserts that the BOCC hearing on March 17, 2009 fell outside that 90 business day window and Anchor's application was automatically approved.  The facts are as set forth below.

Anchor submitted its Application for Special Use to St. Johns County on June 24,

2008.  See  Affidavit of Lisa Bryant, ¶ 3, attached hereto as Exhibit A.  Ms. Bryant was the authorized agent for Anchor for the submission and processing of the application. See Bryant Aff., ¶ 2,  R-1, p. 6.  On August 1, 2008, Ms. Bryant received comments from St. Johns on the application that stated that additional materials would be needed in order for the application to be deemed complete.  See Bryant Aff., ¶ 4.  Anchor, through Ms. Bryant, delivered its second submittal to St. Johns County on September 11, 2008.  See Bryant Aff., ¶5. This submittal addressed all of the comments set forth in the August 1 correspondence except the required environmental assessment. R-1, 45-7.  The requested environmental assessment was submitted to St. Johns County on October 6, 2008. See Bryant Aff., ¶ 6. After the October 6, 2008 submission no further information was requested from St. Johns County.  See Bryant Aff., ¶ 7.  R-4, p. 277-8. The application was originally scheduled to be heard by the PZA on December 4, 2008, but was then moved to the December 18, 2008 meeting.  See  Bryant Aff., ¶¶ 10, 11.  That meeting was cancelled due to lack of a quorum and the application was moved to January 15, 2009.  See Bryant Aff., ¶ 12.  For reasons unexplained the County then moved the application to the February 5, 2009 PZA meeting.  See Bryant Aff., ¶ 13.

Over objection by Anchor, the County did not schedule the scenic highway setback issue until the March 17, 2009 BOCC meeting. See Bryant Aff., ¶¶ 16-18; R-6, p. 519. There were two intervening regularly scheduled meetings of the Board of County Commissioners:  February 17, 2009 and March 3, 2009.

There is no case law construing or applying Section 365.172(12)(d).  Anchor submitted that last additional information necessary for a complete application on October 6, 2008.   No further information was requested.   Pursuant to §

365.172(12)(d)(3)(a), the application was deemed complete on the day of the last resubmission, specifically October 6, 2008.  Section 365.172(12)(2) then provides that the County had 90 business days from October 6, 2008 to take action on the application. The time period of 90 business days from October 6, 2008, excluding November 27, November 28, December 25, December 26, January 1, and January 19, ends on February 17, 2009.  Anchor submits to this Court that no genuine issue of material fact exist and that as a matter of law, Anchor's request to place its Proposed Mono-Cross Tower within in 600' of a scenic highway is automatically approved.

## CONCLUSION

Based on the undisputed facts, the County violated the Act when it denied Anchor's application.  Anchor is therefore entitled to declaratory and injunctive relief as a matter of law.  Anchor respectfully requests that this Court grant it summary judgment in its favor on all counts of the Complaint and grant injunctive and/or mandamus relief ordering St. Johns County to approve the application for special exception use approval.

Dated:  November 5, 2009.

_/s/_____
Mary D. Solik
Florida Bar No. 0856479
*Attorneys for Plaintiff Anchor Tower, LLC*
**LAW OFFICES OF JOHN L. DI MASI, P.A.**
801 N. Orange Avenue, Suite 500
Orlando, FL 32801-1014
Telephone:  (407) 839-3383
Facsimile:  (407) 839-3384
E-mail:  msolik@orlando-law.com