WIRELESS TOWERS, LLC,

          Plaintiff,

vs.                                      Case No. 3:09-cv-634-J-32TEM

ST. JOHNS COUNTY, FLORIDA, a
political subdivision of the State of Florida

          Defendant.

_____

## <u>ORDER</u>[1]

Plaintiff Wireless Towers, LLC ("Wireless")[2] has challenged Defendant St. Johns County, Florida's (the "County") denial of its application to construct a wireless communications facility (more commonly known as a cell tower) as violative of the Federal Telecommunications Act of 1996 (the "Act"), 47 U.S.C. § 151 *et seq.* This case is before the Court on the parties' cross-motions for summary judgment (Docs. 26 & 28) and respective responses in opposition (Docs. 30 & 31). The Court heard oral argument January 20, 2010, the record of which is incorporated by reference. (Doc. 35).

## I.    Background

Wireless provides service to various licensed personal wireless telecommunications

---

[1]Under the E-Government Act of 2002, this is a written opinion and therefore is available electronically. However, it has been entered only to decide the motion or matter addressed herein and is not intended for official publication or to serve as precedent.

[2]On December 3, 2009, Wireless was substituted as plaintiff in this action, replacing original plaintiff Anchor Tower, LLC ("Anchor"). (Doc. 33). Although Anchor was the actual applicant for the proposed cell tower at issue, the Court will refer to Wireless, as the current party in interest, as having been the applicant throughout.

providers by locating, leasing, zoning, constructing, and owning personal wireless services facilities. (Doc. 1 ¶ 6). Provider MetroPCS requested construction of such a facility to close a purported cellular service gap it was experiencing in the Fruit Cove area of St. Johns County, Florida. Accordingly, Wireless proposed to erect a 150-foot camouflaged "monocross" tower on a parcel of land leased from the Episcopal Church in the Diocese of Florida, Inc. (the "Tower Site").[3] MetroPCS agreed to serve as the anchor tenant on the proposed monocross, which would provide enhanced personal wireless service to the surrounding area. (Doc 1 ¶ 7). Provider T-Mobile indicated an interest in collocating on the tower.

The Episcopal Church in the Diocese of Florida, Inc., operates St. Patrick's Episcopal Church on the parent tract of the Tower Site (in its entirety, the "Church Property"). The Church Property, located at 1221 SR 13 North, St. Johns County, Florida, is roughly 5 acres in size and is zoned RS-E (Residential-Single Family) with a Future Land Use designation of Residential-B. The Church Property sits on the east side of SR 13 and extends approximately 600' back from the road, bordering a residential zoning district to its rear. SR 13, also known as the William Bartram Scenic Highway, is a St. Johns County designated Scenic Highway.

A.    *The St. Johns Land Development Code*

Under the St. Johns County Land Development Code ("LDC"), cell towers are allowed

---

[3]A monocross is a monopole wireless communication tower camouflaged to look like a cross, with all antennae internal. The cross design was selected to blend in with the surrounding church property.

as a special use in residential zoning districts. Section 2.03.26 of the LDC, entitled "Antenna Towers," provides, in pertinent part:

> Antenna Towers may be permitted as a Special Use within districts as defined in Section 2.03.01. Such Antenna Towers shall be subject to the requirements of... Section 6.08.12 of this Code and further subject to the following:
>
>> A. Notwithstanding anything to the contrary in this Code, no Antenna Tower other than an unguyed monopole tower or Alternative Tower Structure shall be located in any residential zoning district.
>>
>> B. Regardless of the zoning district in which the Antenna Tower is located, any Antenna Tower proposed to be located within two hundred and fifty (250) feet of the nearest Lot line of any Residential Use, Residential zoning district, residential portion of a Planned Development or Open Rural (OR) zoning district shall be reviewed as a Special Use.
>>
>> C. The applicant shall demonstrate that there are no other suitable existing Antenna Towers or Structures on which the applicant/provider can reasonable [sic] place its antennas, as provided in Section 6.08.12.R.

Sec. 2.03.26, LDC. Section 6.08.12 of the LDC further provides, in pertinent part:

> V.    Antenna Towers Located on Scenic Highways
>
> *No Antenna Tower shall be built or erected within six hundred (600) feet of the center line of any designated Scenic Highway or Scenic Roadway without the final approval of the Board of County Commissioners, after consideration and recommendation by the Planning and Zoning Agency.* The use of an Alternative Tower Structure shall be considered in the approval of an Antenna Tower within six hundred (600) feet of a designated Scenic Highway or Scenic Roadway.[4]
>
> The Board of County Commissioners *shall not issue an approval* for the location of an Antenna Tower within six hundred (600) feet of any designated Scenic Highway or Scenic Roadway as defined in Article XII

---

[4]Part 12.01.00 of the LDC provides that "Scenic Highway or Scenic Roadway (As it applies to Antenna Towers): Means SR 13/CR 13 from Duval County line to SR 207 (William Bartram Scenic Highway)."

> of this Code *unless the applicant establishes that disapproval of such tower would prohibit communications service to a particular area.*

Sec. 6.08.12V, LDC (emphasis added).

B. *Application Process and Planning Department Report*

Section 32 of the St. Johns County Development Review Manual ("DRM") provides a comprehensive outline of the cell tower application and approval process. Tower applications requiring a Special Use permit are reviewed by staff and, when complete, are set for a public hearing before the County's Planning and Zoning Agency ("PZA"). In most circumstances, the decision of the PZA following the hearing is the final action of the County. However, where an applicant requests a waiver of certain Sec. 6.08.12 requirements, such as placement of a tower within the 600' Scenic Highway setback, the application is subject to final approval of the Board of County Commissioners (the "Board"). Sec. 32.05(D), DRM.

On June 24, 2008, Wireless filed an Application for Special Use (the "Application") requesting permission to construct its monocross – which is considered an Alternative Tower Structure – on the Tower Site. Wireless proposed a 150' structure, the maximum height allowable for towers in residential districts constructed for two or more users,[5] so as to provide "needed wireless coverage to the residents of St. Johns County in the Fruit Cove area."[6] (Doc. 27 at R-1, 004). In support of this alleged need, Wireless provided "Before" and "After" coverage maps prepared by MetroPCS's radio frequency engineers depicting

---

[5]Sec. 6.08.12E.1., LDC.

[6]The application also included MetroPCS's letter of support on the issue of need, which stated that "[w]ithout the proposed site, services will be very unreliable for residential and commercial areas along N. State Road 13." (Doc. 27 at R-1, 007).

estimated cellular service levels prior to and after erection of the proposed tower. (Id. at R-1, 014-15).

The Application stated that the Tower Site would be set back 250' from the residential zoning district located to the rear (east) of the Church Property and 288' from the residential lot line to the south of the Church Property, so as to comply with Sec. 2.03.26B. This placed the monocross 350' from the center line of SR 13, less than the 600' required by Sec. 6.08.12V. As a result, the Application was subject to final approval of the Board after consideration and recommendation by the PZA.

The Application was heard by the PZA at its February 5, 2009 meeting. With a vote of 4-3, the PZA approved the tower and recommended approval of the Scenic Highway setback waiver to the Board. (Doc. 27 at R-4, 192). The PZA's decision was based upon the following findings of fact:

> (1) The request is consistent with Section 2.03.01 allowing communication towers in an RS-E zoning district and 2.03.26; conditions for approval of special use permit pursuant to Section 6.08.12 except as waived herein; (2) The request is not in conflict with the Comprehensive Plan; (3) The construction of a 150-foot alternative tower structure with accessory equipment building(s) and antenna in this location is compatible with the surrounding area; (4) The location and placement of communication antenna tower providing compliance with Section 6.08.12 and conditions herein provided promotes the health, safety, and general welfare of the citizens of the area; (5) The antenna tower is necessary to provide telecommunication service to a particular area and there are no suitable existing antenna towers; (6) There are no significant adverse impacts to environmentally sensitive areas or areas judged to possess unique environmental or cultural properties; and (7) At the public hearing the applicant has stated no objections to the conditions.

(Id.)

5

The Board considered the Application at a public hearing on March 17, 2009. County planning staff ("Staff") introduced the issue before the Board as "a request to allow an alternative structure monocross with associated equipment buildings to be located 350 feet from the center line of a Scenic Highway, pursuant to Article 6 of the Land Development Code, which requires that no antenna tower shall be built or erected within 600 feet of the center line of a Scenic Highway or Scenic Roadway, without final approval from the Board of County Commissioners." (Id. at R-7, 558-59). Staff further noted that "the applicant has provided information stating that this location is required by two wireless carriers in order to provide coverage in the Fruit Cove area," and concluded that "[t]he staff finds the request substantially meets the requirements of the land development code with regard to general setbacks, collapse zone distance and is consistent with the comprehensive plan." (Id. at 559-60).

After Staff's presentation, Mary Solik, counsel for Wireless, spoke on behalf of the Application. She began by displaying a photo simulation package which had been prepared "to demonstrate the aesthetic impact of this tower on the neighboring communities." (Id. at 563). The simulations depicted the results of a "balloon test" conducted by Wireless to determine whether the monocross would be visible from certain vantage points, and if so, the extent of that visibility. (See id. at R-6, 523-31). Ms. Solik also presented a map depicting areas marked with solid black lines which indicated "areas where... the balloon was not visible during the photo simulation." (See id. at R-6, 520; R-7, 564). This map indicated that the monocross would be visible from all but a very small portion of SR 13. (Id. at R-6, 520).

At the conclusion of the photo simulation, Commissioner Miner questioned Ms. Solik on the demonstrated need for a tower in the area, noting that "I grew up there[ a]nd I have never had any problem getting great cell phone service out there." (Id. at R-7, 567). Ms. Solik responded by displaying two color-coded "Before" and "After" maps demonstrating MetroPCS's current and projected levels of coverage in the area. (See id. at R-6, 522, 547). The maps depicted six different levels of service, each represented by a different color - Dense Urban (dark green), Urban (green), Suburban (light green), In Car (blue), Outdoor (red) and None (white). In addition, the maps indicated the location of the Tower Site in relation to three existing towers in the area, two of which already hosted MetroPCS' wireless antennae. The "Before" map indicated that a certain level of coverage, mainly in-car and outdoor, existed in the area surrounding the Tower Site.[7] However, Ms. Solik stated that to penetrate structures, i.e., to obtain indoor service, a coverage level in the green zone (dense urban, urban, or suburban) was required. (Id. at R-7, 569). Ms. Solik acknowledged that the map exclusively displayed MetroPCS's coverage levels and that other carriers might have satisfactory coverage in the area, but argued that MetroPCS needed the monocross because

_____

[7]The "Before" map presented at the hearing differed significantly from the "Before" map included in the Application. The Application's "Before" map indicated that MetroPCS's coverage level near the Tower Site was predominately "white;" i.e., no coverage whatsoever. (Doc. 27 at R-1, 014). In contrast, the "Before" map displayed to the Board showed almost no white, with most of the area surrounding the Tower Site covered in blue – i.e., in-car service – with some red (outdoor) and light green (suburban) as well. (Id. at R6, 522). Wireless explains this discrepancy by noting that "the initial application was submitted in June 2008. The application was not heard by the [Board] until almost 9 months later. The difference in the maps is attributable to MetroPCS' installation of antennae on existing towers located near the subject site in the interim period, thereby changing the coverage footprint." (Doc. 31 at 2, n.1).

each personal wireless provider "market[s] their services and it's a competitive environment[;] they market on seamless coverage and coverage that can be used in homes." (Id. at R-7, 570).

After reviewing the maps, Commissioner Mays pressed Ms. Solik further on the stated need for the tower, asking whether Wireless had any empirical data that verified MetroPCS's alleged coverage issues:

> Mr. Mays: [W]hat about empirical data showing that there's a need versus you just telling me? ... I mean, I can see the chart. It looks like there's still some coverage there.
>
> Ms. Solik: There is. It's not the level of coverage that –
>
> Mr. Mays: That they want.
>
> Ms. Solik: – that they want.
>
> Mr. Mays: But there's coverage.
>
> Ms. Solik: You're right. There is some minimal level of coverage.

(Id. at R-7, 576-77).

Commissioner Stevenson then asked Ms. Solik about the option of placing smaller towers atop buildings in the area, rather than constructing a new tower. Ms. Solik indicated that this question was better addressed by Clarence Johnson, MetroPCS' radio frequency engineer, who was just arriving to the hearing. Mr. Johnson said that he was "kind of the stand-in for the actual RF engineer that was scheduled" to attend the hearing and added that he had just had an opportunity to look over the particulars of the Application that morning. (Id. at R-7, 581). He then testified that "the height we're going here on this tower is 145 feet [sic], by need, to cover the area we plan to cover. I don't believe there were buildings – you

8

know, I wasn't a part of the actual design team that drove the area, but I don't believe we had a building that's 145 foot [sic] high that they were able to... mount the antennas on as you mentioned." (Id.)

Regarding the need for a tower of that height in the area, Mr. Johnson consulted the "Before" map and attempted to explain how the proposed monocross would improve coverage in coordination with the existing towers:

> In the case of this one, we had to go... we had to go to 145 foot [sic] in height and basically, by design, have the antennas downtilted, the type of antennas, the gain of the antennas, there's several variables to get the coverage footprint to mate up the coverage as we basically see the difference between here, which the red represents the outdoor coverage, where, basically, red and blue areas, you would not be able to make – or place a call inside your home. There's actually – 145 foot [sic] and whatever variables they have on the antennas – the antenna types and downtilts, you basically link it together where you would actually have coverage inside your homes. I hope I explained that well enough.

(Id. at R-7, 583). Ms. Solik then attempted to clarify Mr. Johnson's expert testimony:

> I think what Mr. Johnson – you know, let me put this in lay terms. The two heavy, dark green circles point to their existing locations. Those are towers that exist today that... MetroPCS has antennas on. So they have – you can see the dense green areas that surround each one of those antenna locations. And you can see how the signal is propagating from those particular locations. It's not propagating far enough between those two locations to match them up and make green all the way up that roadway and to get rid of the red area in the middle. The signal – the antenna locations are too far apart. So they're looking for this additional location at St. Patrick's Church. And they have determined through their modeling – this is all done through a modeling program – that at 145 feet [sic] the signal will propagate sufficiently... that the new location marries up with the two existing locations and provides seamless coverage along that area.

(Id. at R-7, 584-85).

The Board then heard the testimony of ten citizens, three in favor of the Application and seven opposed to it. Al Abatiello, one of the dissenters, spoke on behalf of the William

9

Bartram Scenic and Historic Highway Management Council.  Mr. Abatiello introduced into the record a brochure describing his organization and described its mission: "to protect, preserve, maintain and enhance the natural scenic, historic, cultural and recreational resources along the corridor in concert with the appropriate governmental agencies." (Id. at R-7, 605-06).  He noted that SR 13 is recognized as a Scenic Highway and cited to Objective A.2.1.2(l) of the St. Johns County Comprehensive Plan Goals, Objectives, and Policies, which provides as follows:

> SR 13 is recognized as the William Bartram Scenic Highway and shall be protected for its scenic and historic value to the Northwest area. *New development shall, at a minimum comply with the scenic highway buffers established in the County's Land Development Code. St. Johns County shall continue to enforce these buffers.*

A.2.1.2(l), St. Johns County, Florida EAR Based Comprehensive Plan Amendment (emphasis added).  Focusing on the highlighted language, Mr. Abatiello stated that "quite specifically, the land development code says 600 feet from the center line of [a scenic] highway.  And I think the county commission needs to adhere to that." (Id. at R-7, 608). Another dissenter, Ellen Whitmore, specifically addressed the PZA's finding that the Application was consistent with the comprehensive plan, asserting that "that is not true, not true.  It is inconsistent.... They're asking for a waiver.  They're asking for an exception." (Id. at R-7, 632).

In her rebuttal, Ms. Solik began by stating:

> We're not asking for anything today that's not contemplated by your code.  Your code allows for an alternative tower structure to be placed within 600 feet of the Bartram Scenic [Highway center line], provided some minimal showing is made by the applicant.  We are required to establish that the disapproval of the tower would prohibit communication service to a particular area.

(Id. at R-7, 638). She then called once more upon Mr. Johnson to state his qualifications and testify again as to the need for coverage in the area surrounding the Tower Site.[8] When he concluded, Ms. Solik advised the Board that "there's been no evidence presented to you today that MetroPCS doesn't need coverage out here, except you have the testimony of Mr. Johnson, which is competent substantial evidence, that they do have a need and that... disapproval of this would prohibit his service in that particular area."  (Id. at R-7, 641-42).

Commissioner Stevenson, as chairperson, then turned the matter over to the other Board members for comment.  Commissioner Miner stated that "[w]ireless communications, to me, is a public safety issue.  I wouldn't want my mom or my sisters driving anywhere in this county where they didn't have cell phone coverage and couldn't get some help.  But for me, that hasn't been portrayed today.... There's just no need." (Id. at R-7, 645).  Commissioner Mays asked Mr. Johnson to return to the podium and asked him, point blank: "Prior to today, have you worked on this tower location for MetroPCS?," to which Mr. Johnson replied in the negative.  (Id. at R-7, 646).  Commissioner Mays continued, asking Mr. Johnson whether he would consider himself an expert "on this location, this specific project," to which Mr. Johnson replied: "No, sir." (Id. at R-7, 647).  Commissioner Bryan asked the County attorney whether the County code provisions - specifically, the scenic highway setback requirement - were trumped by federal law.  (Id. at R-7, 647-48).  He then stated "I don't really see the need, based on the information that was provided." (Id. at R-7, 653-54).  Commissioner Stevenson

---

[8]Ms. Solik requested that Mr. Johnson review the "Before" map once more, then asked him to identify the towers upon which MetroPCS was located at that time.  After he did so, Ms. Solik asked: "[D]o you lack existing coverage in the area surrounding the proposed St. Patrick's church site?"  Mr. Johnson responded simply, "Yes, ma'am."  (Id. at R-7, 641).

questioned whether the Board had heard testimony "on the need at this location and no other," and asked Ms. Solik once more to address the issue of tower height. (Id. at R-7 649, 655). Ms. Solik posed the question to Mr. Johnson:

> Ms. Solik: [D]oes MetroPCS need 145 feet [sic] in this location to meet your coverage objective?
>
> Mr. Johnson: In this particular situation, 145 [sic] is what is needed to meet the objective.
>
> . . .
>
> Ms. Solik: Okay. What does this diagram represent [gesturing to the "Before" map]?
>
> Mr. Johnson: Basically, the color code is – according to the landscaping, it's color coded where the suburban [green] would actually represent the actual in-building – or – yeah, the in-building coverage. The blue would actually represent the in-car coverage, traveling. And the red would represent the outdoor coverage. I believe this Julington Creek area kind of represents that, basically, indoor coverage is not – there's no coverage whatsoever. And then when we actually put the 145-foot [sic] tower into play, you increase the coverage in the primary area of Julington Creek to the actual - it's urban coverage, which basically provides you with seamless coverage along State Road 13.
>
> Ms. Solik: And your objective is to get rid of the red and the blue and go to green?
>
> Mr. Johnson: Exactly.

(Id. at R-7, 655-56). Commissioner Stevenson then asked about whether alternative sites were identified or considered. (Id. at R-7, 657). Ms. Solik noted the heavy residential development on all sides of the Tower Site, and stressed the difficulty of meeting both the LDC's scenic highway setback requirements and its residential setback requirements in this particular area. (Id. at R-7, 658). She could not speak to specific sites that were ruled out in favor of the Tower Site, but argued that having to do so was akin to "prov[ing] a universe

12

of negatives." (<u>Id.</u> at R-7, 659).

The Board took a recess to address another issue.  When the item was reopened, Commissioner Stevenson began by noting that "the evidence presented on this tower, for being at such a controversial place, is the weakest I've ever seen."  (<u>Id.</u> at R-7, 667). Commissioner Miner then made a motion to deny the Application, which was amended twice and seconded, and the Board denied the Application unanimously.  (<u>Id.</u> at R-7 at 668-673).

On April 16, 2009, the Board issued an Order Denying Tower 2008-01 AT148/Fruit Cove (the "Order").  The Order contained the following findings of fact in support of the Board's denial:

1.   The request is contrary to the public interest and is in conflict with the surrounding development;

2.   *The request does not meet the criteria set forth in the LDC, specifically including, but not limited to, Section 2.03.26 and 6.08.12V;*

3.   The Request is in conflict with the Future Land Use Designation of Residential-B;

4.   The proposed structure is not consistent with the St. Johns County Comprehensive Plan, particularly the Northwest Sector and Scenic Corridor portions;

5.   *The coverage maps presented by the Applicant do not provide evidence that denial of the application will prohibit communications in the subject area, in fact, the "before" coverage map shows at least three levels of communications coverage in the area;*

6.   The evidence presented by the Applicant, particularly the "before" and "after" coverage maps fail to clearly show that the proposed tower will provide a substantial improvement in coverage in the subject area as described by the Applicant and therefore fails to demonstrate a need for the proposed tower;

7.   The Applicant failed to demonstrate that there was no other suitable location to place a telecommunication tower to serve the subject area, including a

location that would not negatively impact the Scenic Highway Corridor – the evidence presented was speculative in nature; and

8.  The Applicant failed to demonstrate that the requested height of 150 feet is required to ensure that there would not be an effective prohibition of communications service in the subject area and that a lower tower would not suffice to add any desired coverage.

(Doc. 27 at R-9, 694-95)(emphasis added and internal footnotes omitted).

Wireless seeks (i) a declaration that the County violated the Act by failing to base its decision on substantial evidence in a written record and (ii) a mandatory injunction requiring the County to approve the Application. Wireless also seeks a declaration that the County violated the timing requirements for tower approval set forth in § 365.172(12)(d), Florida Statutes. The County contends that its decision was properly supported and that it complied with all applicable time frames. Both parties agree that these issues are appropriately determined on cross motions for summary judgment.

## II.   Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

"In determining whether to grant summary judgment, the Court must view the evidence and inferences drawn from the evidence in the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor." T-Mobile South LLC v. City of Jacksonville , Florida, 564 F.Supp. 2d 1337, 1340 (M.D. Fla. 2008) (citing Augusta Iron & Steel Works, Inc. v. Employers Ins. of Wausau, 835 F.2d 855, 856 (11th Cir.1988); WSB-TV

14

v. Lee, 842 F.2d 1266, 1270 (11th Cir.1988)).

"The principles governing summary judgment do not change when the parties file cross-motions for summary judgment. When faced with cross-motions, the Court must determine whether either of the parties deserves judgment as a matter of law on the undisputed facts." Id.

## III. Discussion

### A. *The Federal Telecommunications Act of 1996*

Congress enacted the Act to "promote competition and higher quality in American telecommunications services and 'to encourage the rapid deployment of new telecommunications technologies.'" Michael Linet, Inc. v. Village of Wellington, Fla., 408 F.3d 757, 761 (11th Cir. 2005) (quoting City of Rancho Palos Verdes, Cal. v. Abrams, 544 U.S. 113, 115 (2005)). "With respect to the construction of telecommunications facilities, Congress recognized zoning decisions by state and local governments had created an inconsistent array of requirements, which inhibited both the deployment of personal communications services and the rebuilding of a digital technology-based cellular telecommunications network." Preferred Sites, 296 F.3d at 1214. Despite this, "Congress also acknowledged 'there are legitimate State and local concerns involved in regulating the siting of such facilities,'" Id. (quoting H.R.Rep. No. 104-204, at 94-95 (1995), reprinted in 1996 U.S.C.C.A.N. 10, 61), and drafted the Act so as to "'preserve[ ] the authority of State and local governments over zoning and land use matters except in... limited circumstances.'" Id. (quoting H.R.Rep. No. 104-458, at 207-08 (1996), reprinted in 1996 U.S.C.C.A.N. 124, 222).

The Act was therefore designed to "strike a balance between 'two competing aims – to facilitate nationally the growth of wireless telephone service and to maintain substantial local control over siting of towers.'" Omnipoint Commc'ns, Inc. v. City of White Plains, 430 F.3d 529, 531 (2d Cir. 2005)(quoting Town of Amherst, N.H. v. Omnipoint Commc'ns, 173 F.3d 9, 13 (1st Cir. 1999)).  Thus, while local authorities retain the authority to regulate the placement and construction of towers, such regulation "shall not prohibit or have the effect of prohibiting the provision of personal wireless services."  47 U.S.C. § 332(c)(7)(B)(i)(II). Further, "[a]ny decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing *and supported by substantial evidence contained in a written record.*"[10] Id. § 332(c)(7)(B)(iii) (emphasis added).

"[T]he 'substantial evidence' standard is the traditional substantial evidence standard used by courts to review agency decisions."  Linet, 408 F.3d at 762.  This standard has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Id. (internal citation and quotation omitted).  As such, substantial evidence requires "more than a mere scintilla but less than a preponderance." Id. (internal citation and quotation omitted).  In utilizing this standard, a court may not substitute its own judgment for that of the local governing body.  Preferred Sites, 296 F.3d at 1218.  The party seeking to overturn the governing body's decision bears the burden of proving that the

---

[10]The relevant "record" within the meaning of § 332(c)(7)(B)(iii) is the "written record of all the evidence before the governing body at the time the decision was made."  Vertex Development, LLC v. Marion County, Fla., 2008 WL 2994259 at *13 (M.D. Fla. Aug. 1, 2008) (citations omitted).

decision is not supported by substantial evidence.  <u>American Tower LP v. City of Huntsville</u>, 295 F.3d 1203, 1207 (11th Cir. 2002).

Wireless's primary argument is that the decision of the Board is unsupported by substantial evidence because "the Findings of Fact set forth in the Board's Order are all either: 'findings' on issues which the PZA has already taken contrary and final action; not limited to the narrow issue before the Board; or are inaccurate characterizations of the testimony on the record." (Doc. 28 at 16).  With regard to the "narrow issue before the Board," Wireless interprets Section 6.08.12V of the LDC[11] to limit the Board's consideration of the Application to "whether Anchor demonstrated that 'disapproval would prohibit communications service to a particular area.'" (<u>Id.</u>)  Wireless contends that because MetroPCS's "Before" map demonstrated "an almost complete lack of indoor coverage in the area of the Proposed Mono-Cross,"  which evidence was uncontroverted, it has met its burden under the LDC.  (<u>Id.</u> at 18).  Wireless then cites <u>T-Mobile South, LLC v. Coweta County, Ga.</u>, 2009 WL 596012 (N.D.Ga. 2009) for the proposition that "[t]he Board's personal conclusion that the coverage maps do not provide evidence that denial would prohibit communications service in the area does not constitute substantial evidence." (Doc. 28 at 18).

The County disputes Wireless's interpretation of Sec. 6.08.12V with respect to the Board's consideration of exceptions to the 600' Scenic Highway setback requirement.  It notes that nothing in the LDC expressly or impliedly limits the Board's scope of review to the

---

[11]<u>See</u> p. 3-4, *supra*.

issue of prohibition of service, nor does the LDC provide that the PZA's determination of all other issues is binding upon the Board. The County therefore contends that the Board was authorized to review the Application as a whole and to deny the waiver request on any permissible ground, such as aesthetic concerns or the failure to demonstrate a lack of alternative locations for the proposed tower. However, the County argues that even if prohibition of service were the only issue the Board could consider, its decision to deny the application on the grounds that Wireless failed to establish "that denial of the application would prohibit communications in the subject area" – as memorialized by findings of fact numbers 2 and 5 in the Order – was supported by substantial evidence. (Doc. 27 at R-9, 695).

The Court will assume without deciding that the Board's consideration of the Application was limited to the Scenic Highway setback waiver. Similarly, the Court will assume without deciding that in considering the waiver request, the Board was authorized only to determine whether Wireless successfully carried its burden of establishing that denial of the Application would constitute a prohibition of communications service to the area surrounding the Tower Site. Under this scenario, the Court must uphold the decision of the Board if there is "such relevant evidence as a reasonable mind might accept as adequate to support [the Board's] conclusion" that Wireless failed to carry its burden. Linet, 408 F.3d at 762. Further, the Act "requires only that the *adverse action* be supported by substantial evidence, not that *each individual reason* for the adverse action be supported by substantial evidence." United States Cellular Corp. v. City of Wichita Falls, TX, 364 F.3d 250, 259 (5th Cir. 2004)(emphasis added).

18

The Court's first inquiry is which substantive legal standard to apply in determining whether Wireless has "establishe[d] that disapproval [of the proposed monocross] would prohibit communications service" to the Fruit Cove area, as required by Section 6.08.12V of the LDC. The County assumed in its Motion for Summary Judgment that the Act's federal prohibition of service standard was overlaid upon Section 6.08.12V, and thus that the Board was required to deny the Application unless Wireless successfully demonstrated that denial would prevent MetroPCS from closing a "significant gap" in service coverage.[12] However, despite the similar language in Section 6.08.12V and § 332(c)(7)(B)(i)(II) regarding prohibition of service, Wireless expressly disclaims the applicability of the federal standard to the question of whether it has satisfied its burden under the LDC.[13] Instead, Wireless

_____

[12]Per § 332(c)(7)(B)(i)(II) of the Act, "[t]he regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof... shall not prohibit or have the effect of prohibiting the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(B)(i)(II). Though the Eleventh Circuit has not yet addressed the issue, other circuits have held that "a locality can run afoul of the [Act]'s 'effective prohibition' clause if it prevents a wireless provider from closing a 'significant gap' in service coverage." Sprint PCS Assets, LLC v. City of Palos Verdes Estates, 583 F.3d 716, 726 (9th Cir. 2009)(citation and quotation omitted); see also APT Pittsburgh Ltd. Partnership v. Penn Tp. Butler County of Pa., 196 F.3d 469, 480 (3d Cir. 1999); Sprint Spectrum, L.P. v. Willoth, 176 F.3d 630, 643 (2d Cir. 1999). However, Wireless does not contend that MetroPCS has been prevented from closing a "significant gap" in service coverage, nor that denial of the Application effects a prohibition of service under § 332(c)(7)(B)(i)(II) of the Act. Instead, Wireless contends that the Board's determination that Wireless failed to establish a prohibition of service as required by Sec. 6.08.12V of the LDC is unsupported by substantial evidence, in violation of § 332(c)(7)(B)(iii). As Wireless has not alleged that the County's action was an effective prohibition of service under § 332(c)(7)(B)(i)(II), the Court will not reach this issue.

[13] Noting that the LDC does not expressly reference the prohibition standard of § 332(c)(7)(B)(i)(II), Wireless argues that the federal interpretation should not be applied to Sec. 6.08.12V:

identifies the proper standard for determining prohibition of service under the LDC as whether the action of the Board prevented it from providing seamless indoor (i.e., "green") service to the Fruit Cove area.  Though Wireless can provide no support for this position, it contends that indoor coverage is the "industry standard" and is required by providers to succeed in the competitive personal wireless services environment.  For its part, the County argues that if the federal standard is not applied, the Court should adhere to the plain language of Section 6.08.12V; using this plain language, the Board was required to deny the Application "unless [Wireless] establishe[d] that disapproval" of the tower "would prohibit communications service" in the affected area.

As Wireless is disclaiming application of the Act's prohibition of service standard to Section 6.08.12V, the Court must be guided by the plain language of Sec. 6.08.12V.  <u>See</u> <u>Metropolitan Casualty Ins. Co. v. Tepper</u>, 2 So. 3d 209, 213 (Fla. 2009) (Under Florida law, "[w]hen a statute's language is plain and unambiguous, there can be no resort to statutory

------

The County... argues that [Wireless] failed to establish a prohibition of service. Although the County identifies the appropriate standard, that is the provision in its own code, Section 6.08.12V, the County cites to federal case law interpreting another provision of the TCA not raised by [Wireless'] complaint.  Based on this federal case law construing 47 U.S.C. § 332(c)(7)(B)(i)(II), the County argues that [Wireless] had the burden, under its local zoning code, of establishing a "significant gap in coverage" rather than prohibition of communications service to a particular area. [Wireless] asserts that it is inappropriate to apply federal case law construing a federal statute to a differently worded local government land use ordinance.

(Doc. 31 at 2-3).

construction").[14]   While Wireless would like to read "indoor," "seamless coverage," and "industry standard" into Section 6.08.12V, such language simply does not exist.   Rather, before the Board was authorized to approve a waiver to the 600' Scenic Highway setback, Wireless was required to show that "communications service" to the area would be "prohibited" without approval of the tower.   The question then becomes whether the Board's determination that such a showing was not made is supported by substantial evidence.

Wireless relies on <u>Coweta</u> for its treatment of a similar issue.   <u>Coweta</u>, 2009 WL 596012 at *7.   In <u>Coweta</u>, the county justified its denial in part on T-Mobile's alleged failure to demonstrate a need for the tower in the affected area.[15]   <u>Id.</u>   As in this case, the Board viewed "Before" and "After" coverage maps and heard testimony that some level of coverage was present in the area.   <u>Id.</u>  Based on its visual comparison of the maps, and without expert testimony to contradict that of T-Mobile's RF engineers, the Board concluded that the provider had not properly established a coverage need in the area.   <u>Id.</u>

Regarding the appropriate standard for determining whether a local government has satisfied the substantial evidence requirement in such a scenario, the <u>Coweta</u> court stated:

No case in the Eleventh Circuit directly addresses conflicts in opinion on coverage issues. The Third Circuit has held that determinations "concerning the

---

[14]Though legislative history cannot trump the plain language of an unambiguous statute or ordinance, <u>Tropical Coach Line, Inc. v. Carter</u>, 121 So.2d 779, 782 (Fla.1960) ("If the language of the statute is clear and unequivocal, then the legislative intent must be derived from the words used without involving incidental rules of construction or engaging in speculation as to what the judges might think that the legislators intended or should have intended"), here there is no legislative history in any event.

[15]Among the other reasons cited by Coweta County for denial of T-Mobile's application were the failure to show consideration of alternative sites, and aesthetic concerns. <u>Id.</u> at *7.

quality of existing service must be based on substantial, competent evidence and remain subject to judicial review." Cellular Tel. Co. v. Zoning Board of Adjustment of Ho-Ho-Kus, 197 F.3d 64, 71 (3d Cir. 1999). Other courts have noted that a "decision that is based on the resolution of technical issues cannot be sustained under the substantial evidence standard where the determination was made based not on testimony and evidence in the record but rather on the adjudicator's own independent findings on the technical issues." PrimeCo Personal Communications Ltd. P'ship v. City of Mequon, 242 F.Supp. 2d 567, 577-78 (E.D. Wis. 2003) (rejecting city's argument that it was free to make a policy decision that sites providing certain percentage of coverage were adequate), aff'd, 352 F.3d 12147 (7th Cir.2003) (Posner, J.). An "adjudicator's unsubstantiated belief is insufficient" under the substantial evidence standard. Id. at 578.

Id. However, the court went on to note that "the decisions of the Board must be *based on the requirements set forth in the local zoning ordinance*." Id. (citing Cellular Tel. Co. v. Town of Oyster Bay, 166 F.3d 490, 494 (2d Cir. 1999)("When evaluating the evidence, local and state zoning laws govern the weight to be given the evidence" and the Act does not "affect or encroach upon the substantive standards to be applied under established principals of state and local law"))(emphasis added). The court, noting that "*[n]othing in Coweta County's Tower Ordinance requires T-Mobile to 'prove' a coverage gap*," found the Board's decision to be unsupported because "[t]he Board's own personal conclusion that there is not a significant improvement in coverage is not substantial evidence." Id. at *8 (emphasis added).

Citing this latter language, Wireless argues that "the only competent substantial evidence before the Board were [sic] the MetroPCS maps and the Board is not free to ignore it [sic]." (Doc. 28 at 18). However, Wireless ignores the impact of the LDC upon the evidence that was before the Board. In Coweta, the application met all applicable zoning and setback requirements. Coweta, 2009 WL 596012 at *2. In contrast, the Application in

this case proposed a tower within a St. Johns County designated Scenic Highway setback. The LDC *affirmatively requires* an applicant seeking waiver of the Scenic Highway setback requirement to establish that denial of its application would result in a "*prohibition of communications service to a particular area.*" On this subject, the Board viewed coverage maps at the hearing which indicated far more service in the area than was present when the Application was first filed. Ms. Solik admitted, and the maps confirmed, that MetroPCS did have some level of service around the Tower Site. In addition, MetroPCS's "expert" witness had almost no knowledge whatsoever of the Application or his employer's stated need for a tower in the area, apart from acknowledging that their general objective was to "get rid of the red and the blue and go to green." (Doc. 27, R-7 at 656). Based on this evidence, the Board determined that the Application did not carry the burden required by Section 6.08.12V.

The <u>Coweta</u> court conceded that "there could be certain circumstances where the visual comparison of the 'before' and 'after' coverage charts might demonstrate such a lack of improvement that the Board could have substantial evidence to deny a tower in the selected location." <u>Coweta</u>, 2009 WL 596012 at *8, n.1. This is an analogous circumstance. Wireless had the burden of establishing that denial would *prohibit communications service* to the Fruit Cove area. The maps displayed by Wireless at the hearing demonstrated that at least some level of service was present in the area. As such, the decision to deny for failure to show prohibition of service was not merely "the Board's own personal conclusion." <u>Id.</u> at *8. Rather, the Board's decision is properly supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Linet</u>, 408 F.3d at 762. As a result, this Court may not substitute its own judgment for that of the Board.

23

Preferred Sites, 296 F.3d at 1218.

    B.    *Section 365.172(d)(12), Florida Statutes*

Count III of Wireless's complaint seeks declaratory relief pursuant to § 365.172(12)(d), Florida Statutes, which requires that a local government act on an application for placement of a wireless communications facility no later than 90 days after the application is determined to be properly completed.  Failure to comply with the timeliness requirements results in automatic approval of the application.  Sec. 365.172(12)(d)(3)(b), Fla. Stat.

No court (state or federal) has interpreted this portion of § 365.172(12)(d).  Thus, this is an issue of first impression under Florida law, which should, if possible, be decided by a Florida court.  Having adjudicated the federal claims, the Court has discretion not to exercise supplemental jurisdiction over Wireless's state law claim.  28 U.S.C. § 1367(c)(1), (3); see also Hicks v. Moore, 422 F.3d 1246, 1255 n.8 (11th Cir. 2005).  Accordingly, the Court declines to exercise jurisdiction over Count III of Plaintiff's complaint.  See United Mine Workers of America v. Gibbs, 383 U.S. 715, 726-27 (1966).

## IV.    Conclusion

For the foregoing reasons, it is hereby

**ORDERED**:

1.  Defendant St. Johns County, Florida's Motion for Summary Judgment (Doc. 26) is **GRANTED** as to Counts I and II of the Complaint.  Count III of the Complaint is **DISMISSED WITHOUT PREJUDICE.**

2.  Plaintiff Wireless Towers, LLC's Motion for Summary Judgment (Doc. 28) is **DENIED**.

24

3.  The Clerk shall enter judgment in favor of Defendant and against Plaintiff, and close the file.

**DONE AND ORDERED** at Jacksonville, Florida this 3rd day of February, 2010.

TIMOTHY J. CORRIGAN
United States District Judge

jmm.
Copies:

counsel of record